**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Carlos Rafael HERNANDEZ (93–1987);**
**Eugenio Nunez–Muro (93–2015),**
**Defendants–Appellants.**

Nos. 93–1987, 93–2015.

United States Court of Appeals,
Sixth Circuit.

Argued May 9, 1994.

Decided and Filed June 14, 1994.*

Certiorari Denied Oct. 3, 1994.

See 115 S.Ct. 285.

---

* This decision was originally issued as an "unpublished decision" filed on June 14, 1994. On July 12, 1994, the court designated the opinion as one recommended for full-text publication.

J. Michael Buckley, Office of the U.S. Atty., Detroit, MI (argued and briefed), for the U.S.

William A. Brisbois (argued and briefed), Brisbois & Brisbois, Saginaw, MI, for Eugenio Nunez-Muro.

R. Steven Whalen, Detroit, MI (argued and briefed), for Carlos Rafael Hernandez.

Before: RYAN, NORRIS, and SUHRHEINRICH, Circuit Judges.

RYAN, Circuit Judge.

A jury convicted defendants on several drug related charges, including conspiracy to distribute cocaine and to possess cocaine with the intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and possession of cocaine with the intent to distribute, also in violation of 21 U.S.C. § 841(a)(1). Both defendants appeal, raising several challenges to their convictions and sentences. We affirm on all issues.

## I.

Miguel Alvarez was the government's key witness in this case. In early 1992, Alvarez knew that the government was either about to, or had already, filed charges against both him and his wife for student loan fraud. The details of the fraud are not disclosed in the record, but it apparently involved about a million dollars. On May 26, 1992, Alvarez met with DEA agents and told them that a friend, Eugenio Nunez, had approached him about storing cocaine in the freezer at Alvarez's house. Alvarez agreed to cooperate in an investigation of Nunez with the DEA in exchange for a favorable deal on the student loan fraud charges.

As part of the deal, Alvarez pled guilty to lesser charges and Alvarez's wife's sentence was reduced. In addition, the DEA gave Alvarez $12,750 in cash and expenses for his cooperation and another $3,500 for the use of his premises in another case. One of the DEA agents conceded that it was unusual to give that much money to a confidential informant. The DEA also provided Alvarez with a microcassette recorder, tapes, and an induction coil device to record telephone conversations. These devices were used to record most of the conversations between Alvarez, Nunez, and others.

The DEA instructed Alvarez to ask Nunez whether he was still interested in storing cocaine in Alvarez's freezer. On July 16, 1992, Alvarez called the DEA agents and advised them that Nunez was coming to his house. The agents began surveillance and

observed Nunez and his wife arrive at the Alvarez home. Nunez checked to see how much cocaine would fit in the freezer.

Two weeks later, on July 28, Nunez called Alvarez and told him to go to a specific house in Detroit. Nunez and another man met Alvarez there and gave him three kilograms of cocaine to store. Nunez wore rubber gloves when handling the cocaine and told Alvarez that he would give Alvarez one more kilo, probably the next day. Alvarez gave the cocaine and the tapes of the conversation to the DEA.

The next day, Alvarez again met Nunez at the same house in Detroit. Nunez, wearing rubber gloves, gave Alvarez one kilo of cocaine and told Alvarez that he should wear gloves to avoid leaving fingerprints on the cocaine. Alvarez again turned the cocaine and the tapes over to the DEA. The DEA agents told Alvarez that if Nunez ever showed up at his house to check on the drugs, Alvarez should tell Nunez that he sold the cocaine to some people up north on consignment.

Nunez did indeed show up at Alvarez's house, and he accepted Alvarez's explanation for the missing cocaine. On the same visit, Nunez again measured the freezer in Alvarez's garage to see how much cocaine it would hold. Nunez also examined Alvarez's car to determine its suitability for transporting a large shipment of cocaine from New York. Nunez discussed the possibility of Alvarez going to New York, but stressed that he wanted to resolve the situation of the four kilos before the trip.

On August 6, 1992, Nunez called Alvarez and came to his house. Nunez again asked about the four kilos. Alvarez told him that the "people up north" had sold one kilo and would be bringing $31,000. Alvarez also told Nunez that the people wanted to hold on to the other three kilos because they were sure they could sell them. Nunez told Alvarez that he was leaving for New York that day. He instructed Alvarez to replace Alvarez's worn tires, and then suggested that Alvarez rent an inconspicuous car. Nunez also told Alvarez to wear a business suit while driving. He informed Alvarez that he would call him from New York with further instructions about when to leave.

Nunez apparently called Alvarez before he left for New York. During that call Alvarez informed Nunez that the people up north were bringing the $31,000 and that they would sell the remaining three kilos in the next day or two. Nunez instructed Alvarez to take the money and the remaining cocaine to the same house in Detroit where he had picked up the cocaine. Alvarez did so, but had instructions from the DEA to try and retain possession of the three kilos. Alvarez met Nunez at the house, handed over the cash, and told Nunez that the people up north wanted the three remaining kilos of cocaine left at Alvarez's house, so they could pick them up for distribution. After some discussion with an unidentified man, Nunez agreed to let Alvarez retain possession of the three kilos. The unidentified man left with the cash.

Nunez then told Alvarez that he was leaving for New York that afternoon and promised Alvarez $1,000 for each kilo of cocaine that Alvarez would transport from New York to Detroit. Alvarez agreed and told Nunez he would rent a car for the trip. The next day, Alvarez called Nunez's house to see if Nunez had left for New York. Defendant Carlos Hernandez, who is Nunez's stepson, answered the phone. This was Hernandez's first known involvement in the case. Alvarez asked to speak to Nunez's wife, who told him that Nunez had not yet arrived in New York. Alvarez testified that he had no other conversation with Hernandez at that time.

Later that same day, Nunez called Alvarez from the Lexington Hotel in New York with instructions for Alvarez to leave the next day and meet Nunez in New York. Alvarez drove to New York and met Nunez at his hotel room. Nunez had already obtained another room at the same hotel for Alvarez. Nunez gave him the room key and told Alvarez to freshen up because they were going to meet Nunez's supplier. Nunez also said they would be bringing twenty kilos back to Detroit.

Two days later, on August 10, 1992, Nunez and Alvarez checked out of the hotel and took Alvarez's rented car to the source, who

put a large duffel bag containing the cocaine in the trunk. Alvarez told Nunez that they should not take the cocaine back to his house, since his house had gone into foreclosure. Nunez agreed and told Alvarez to take the cocaine to a house on Lyndon Street in Detroit. The house belonged to defendant Hernandez. Nunez and a companion followed Alvarez out of New York.

Nunez was the first to arrive at Hernandez's house. Hernandez was waiting in the front yard, and he and Nunez conversed while they awaited Alvarez's arrival. Meanwhile, Alvarez pulled off the highway and met a DEA agent, who examined the contents of the duffel bag. Alvarez then continued on his way to Hernandez's house. When he arrived, Nunez and Hernandez directed him to pull into the driveway.

After Alvarez got out of the car, Hernandez pulled the car further into the driveway and opened the trunk. Nunez and Hernandez then examined the duffel bag, and Nunez expressed concern over whether it contained twenty kilos. Hernandez removed the duffel bag from the car and placed it near the house. He then backed the car down the driveway and got out. At that point, the DEA agents converged on the scene, made arrests, and seized the duffel bag.

The agents then executed a search warrant for the house. The search revealed $3,249 in cash in the living room closet, and, in the basement, an Ohaus triple beam scale, a plastic baggie heatsealer, and several plastic baggies. Hernandez kept a puppy in the basement, and the puppy had evidently scattered the baggies. The agents did not seize the baggies because they were covered with dog feces. A later chemical analysis found cocaine residue on the scale. It is not clear, however, whether the scale belonged to Hernandez. Hernandez's girlfriend testified that their landlord had left some things in the basement.

## II.

### A. Hernandez

Hernandez first argues that the government did not present sufficient evidence to support his conviction. In reviewing a claim of insufficient evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

This court has enunciated the essential elements of a drug conspiracy many times:

> In drug conspiracy cases pursuant to 21 U.S.C. § 846, the government must prove that a conspiracy existed, that the accused knew of the conspiracy, and that he knowingly and voluntarily joined it.... "Participation in the conspiracy's common purpose and plan may be inferred from the defendant's actions and reactions to the circumstances." ... Mere presence at the crime scene is insufficient.... "Proof of knowledge is satisfied by proof that the defendant knew the essential object of the conspiracy.... Every member of a conspiracy need not be an active participant in every phase of the conspiracy, so long as he is a party to the general conspiratorial agreement." ... "The connection of the defendant to the conspiracy need only be slight, if there is sufficient evidence to establish that connection beyond a reasonable doubt." ... A defendant's guilty knowledge and voluntary participation may be inferred from surrounding circumstances.... Further, "[a] conviction will not be reversed for lack of evidence that a defendant ... knew each detail of the conspiracy."

*United States v. Christian,* 786 F.2d 203, 211 (6th Cir.1986) (citations omitted).

▇ Although it is a close question, we believe sufficient evidence does exist to support Hernandez's conviction. Four pieces of evidence support this conclusion. First, Nunez made a phone call from his hotel room in New York to his service station where Hernandez was working. To be sure, there is no proof that Hernandez answered the phone or spoke with Nunez, and this alone is not sufficient to support a conviction, but it is one small item of circumstantial evidence that the jury was allowed to consider.

Second, Nunez and Alvarez delivered the twenty kilos of cocaine to Hernandez's house when Hernandez was present. Hernandez himself moved Alvarez's rental car and opened the trunk. In addition, Hernandez was present when Nunez commented on the quantity of the cocaine in the duffel bag. While Hernandez made no comments at that time, it cannot be disputed that he knew what was transpiring and that he took an active part by removing the duffel bag from the car and placing it next to his house.

Third, Nunez invited Alvarez into the house and promised to pay him $1,000 at that time. The only quantity of money sufficient to pay Alvarez was the $3,249 found in Hernandez's closet, which he admits was his. Finally, Hernandez's basement contained a scale, baggies, and a heatsealer. While he argued that this was not his equipment, that was a question of fact for the jury, which they obviously resolved against him.

■ Hernandez's second assignment of error relates to a statement the court made to the jury, after charging the jury, but before sending them out to deliberate:

Now ladies and gentlemen, what we're gonna do is, we're going to have you go into the jury room, but all I want you to do at this time is to just pick someone to lead your discussions, because I have to take up some matters with the attorneys concerning, concerning the instructions. And so I want you to just pick someone to lead, pick a a [sic] foreman, somebody to lead, and he or she will take care of things.

To whoever that is, I just want to say this, I found out as a, as a State Circuit Judge out in Oakland County over a number of years, and as a Federal Judge, that many times the jurors will sit down and start taking the issues one by one. And after they spent twenty or thirty minutes discussing, they find out that they all agreed on it right at the beginning. So whoever becomes your foreman, take a lot of votes. That's the way to move it, take a lot of votes. Find out how everybody thinks about each issue as it comes up, because you just might have, you know, unanimity on a particular issue.

Hernandez argues that this instruction conveyed the message that speedy deliberations were more important than thorough deliberations. While we think the district court's comment was unfortunate and potentially troublesome, we do not believe it prejudicially interfered with the jury's deliberations. Viewed in isolation, the comment might be construed as denigrating thorough deliberation, but we must consider the jury instructions as a whole. When viewed in their totality, the instructions adequately explained to the jury its task and the importance of deliberation.

In his third assignment of error, Hernandez contends that the trial court's refusal to allow *voir dire* questions regarding prospective jurors' personal experiences with drugs hampered his ability to intelligently exercise his peremptory challenges, as well as to challenge jurors for cause. We decline to reach this issue because Hernandez failed to preserve it for review by not raising it at his second trial.

During trial, the court made a remark to the jury concerning the use of surnames in Spanish-speaking countries. In his fourth allegation of error, Hernandez argues that this comment constituted improper testimony and that the court essentially vouched for the credibility of a witness. This issue is devoid of merit. *See United States v. Morrow,* 977 F.2d 222 (6th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2969, 125 L.Ed.2d 668 (1993) (*en banc*); *United States v. Mosely,* 810 F.2d 93 (6th Cir.), *cert. denied,* 484 U.S. 841, 108 S.Ct. 129, 98 L.Ed.2d 87 (1987).

In his final assignment of error, Hernandez contests the district court's decision to sentence him as a repeat offender. We decline to reach this issue, as it was not raised below.

### B. Nunez

■ At trial, Nunez argued that he was entrapped. On appeal, he contends that the government did not provide sufficient evidence to show that he was predisposed to commit the crime of drug trafficking. This court has previously discussed the relevant legal standards:

The defense of entrapment "focus[es] on the intent or predisposition of the defen-

dant to commit the crime." ... "It is only when the Government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play." ...

... [O]nce the issue of predisposition is in dispute, the Government must prove beyond a reasonable doubt that the defendant was predisposed to commit the offense....

Predisposition has been defined as "the defendant's state of mind before his initial exposure to government agents." ... Factors relevant in determining the defendant's state of mind include:

the character or reputation of the defendant, including any prior criminal record; whether the suggestion of the criminal activity was initially made by the Government; whether the defendant was engaged in the criminal activity for profit; whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion; and the nature of the inducement or persuasion supplied by the Government.

*United States v. Johnson,* 855 F.2d 299, 303 (6th Cir.1988) (citations omitted).

■ Nunez points to three factors in support of his claim of entrapment: he has no criminal record; he owns a legitimate business; and Alvarez is a longtime friend who was in dire financial straits. These factors, however, are clearly outweighed by the other evidence introduced at trial. Nunez made the first approach to Alvarez about storing cocaine at Alvarez's house, not vice versa. In addition, Nunez appeared to know a great deal about cocaine trafficking. He gave Alvarez advice about wearing rubber gloves, about how much cocaine would fit in his freezer, about renting a car for the trip to New York, and about wearing a business suit while driving. In addition, Nunez knew how to set up deals of four kilos and twenty kilos of cocaine. These are not the actions of an innocent dupe having no predisposition to commit the crimes charged.

■ Nunez's second assignment of error concerns the district court's refusal to allow him to introduce the original indictment against Alvarez into evidence. At trial, the government questioned Alvarez about his Rule 11 plea agreement and the benefit he gained from cooperating with the government in the investigation. Alvarez pled guilty to a superseding indictment. Before cross-examination began, the court considered the admissibility of the original indictment against Alvarez. The court refused to admit the indictment, citing Fed.R.Evid. 608(b)'s prohibition against using extrinsic evidence to attack a witness's credibility. The court stated, however:

I'll permit the defense to read from the Rule 11 Plea Agreement. I'll permit you to read from the indictment as to those charges that he pled guilty to. I also will permit you to ask him, as a matter of fact, were there other charges that were, that you were charged with? But I'm not going to let you go into each specific item in the indictment. I think that is, that is extremely prejudicial.

Nunez argues on appeal that this ruling violated Fed.R.Evid. 404(b). Simply put, this is not a 404(b) issue. Essentially, Nunez is claiming that he was denied the ability to impeach Alvarez. This allegation must fail. The motives underlying Alvarez's cooperation with the government, and the benefits he hoped to obtain from that cooperation, were fully explored in both direct and cross-examination.

■ Nunez's next allegation of error relates to a sealed document that was filed in Alvarez's case the day before sentencing. Nunez sought a copy of the document, but the trial judge refused the request. The trial judge also refused to review the document *in camera* to see whether it contained *Brady* material after the government's attorney told the court that the document did not contain any such material. Nunez argues that the court had an independent duty to review the sealed document. According to Nunez, if the document related to the benefits Alvarez received for cooperating, it could affect Alvarez's credibility. Nunez contends that, because the reliability of a key witness is a crucial issue at trial, the document could very well have been *Brady* material.

The Supreme Court has clearly established that evidence relating to the credibility of a key witness is subject to disclosure under *Brady*. *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The prosecuting attorney, however, informed the court that he had reviewed the sealed document and that it did not contain any *Brady* material. The prosecuting attorney is an officer of the court and, absent some indication of misconduct, the court is entitled to accept his representations on this issue. Nunez has presented no evidence of misconduct. This is not a case where the government concealed the fact that it had offered a deal to a key witness. Instead, the parties all knew of the deal offered to Alvarez, and the details of that deal were disclosed to the jury. Consequently, the district court did not abuse its discretion by refusing to conduct an *in camera* review of the sealed document.

Nunez's final assignment of error relates to his sentence. The district court sentenced Nunez on July 15, 1993, to 188 months imprisonment and five years supervised release. In the process of determining Nunez's sentence, the district court denied Nunez's request for a two point reduction due to acceptance of responsibility. Nunez argues that he clearly accepted responsibility and is therefore entitled to the two point reduction in his offense level. Nunez bolsters his argument by referring to *United States v. Fleener*, 900 F.2d 914 (6th Cir.1990). In *Fleener*, the defendant went to trial, asserted entrapment, was convicted, and still received the two point reduction.

 We have repeatedly held that a clearly erroneous standard applies when reviewing a district court's determination to deny a reduction for acceptance of responsibility. *See, e.g., United States v. Tucker*, 925 F.2d 990, 991 (6th Cir.1991). Indeed,

> "[b]ecause the trial court's assessment of a defendant's contrition will depend heavily on credibility assessments, the 'clearly erroneous' standard will nearly always sustain the judgment of the district court in this area."

*United States v. Wilson*, 878 F.2d 921, 923 (6th Cir.1989) (quoting *United States v. Thomas*, 870 F.2d 174, 176 (5th Cir.1989)).

 In *Fleener*, 900 F.2d 914, the government appealed from the district court's imposition of the two-level reduction when a defendant pled guilty to two counts, but had argued that he had been entrapped into committing the remaining three child pornography-related counts. This court held that the reduction was not clearly erroneous, reasoning that asserting the defense was tantamount to pleading not guilty. Therefore, the reduction was not *per se* unavailable to a defendant who goes to trial based on the defense of entrapment. The court then emphasized that "[f]rom a review of the record it is clear that the district court explicitly linked the two-level reduction for acceptance of responsibility to the fact that Fleener voluntarily turned over the tapes and letters to the agents at the time the search warrant was executed," and that the application notes specifically reference voluntary cooperation with authorities as a factor warranting reduction. *Id.* at 918.

*Fleener* does not stand for the proposition that all defendants who go to trial and assert entrapment are entitled to receive the reduction for acceptance of responsibility. Rather, *Fleener* holds that such a reduction is not *per se* unavailable; the court may award the reduction if it finds the facts warrant it. Here, the district court explicitly found that the facts did not warrant the reduction. Nunez has not shown that this finding was clearly erroneous.

### III.

We **AFFIRM** both Hernandez's and Nunez's convictions and sentences.