UNITED STATES of America,
Plaintiff–Appellee,

v.

Lazaro QUINONES–CEDENO and
Ricardo Rodriguez, Defendants–
Appellants.

Nos. 01–1140, 01–2030.

United States Court of Appeals,
Sixth Circuit.

Nov. 20, 2002.

Before SILER, DAUGHTREY and GILMAN, Circuit Judges.

PER CURIAM.

Defendants Lazaro Quinones and Ricardo Rodriguez, along with six co-defendants, were charged in a one-count indictment with conspiracy to possess cocaine with the intent to distribute and conspiracy to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) and § 846. The other defendants entered guilty pleas, but Quinones and Rodriguez pleaded not guilty and were convicted at the end of a two-week-long trial. On appeal, both defendants claim that the evidence was insufficient to support the jury's verdict, that there was a fatal variance between the proof at trial and the indictment, and that the jury should have been instructed on the law regarding multiple conspiracies. In addition, Quinones claims that the district judge erred in admitting an anonymous note introduced by the government under an exception to the hearsay rule, and Rodriguez contends that the affidavit used to secure authorization for a government wiretap of a co-defendant's telephone was not supported by evidence sufficient to establish probable cause and necessity. We find no reversible error and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The evidence at trial demonstrated that the eight co-conspirators bought and sold cocaine among themselves for their own use and for resale to others between June and December of 1999. On November 10, 1999, an undercover informant purchased a small packet of cocaine at a Detroit apartment shared by Quinones and his girlfriend. The next day, after obtaining a warrant, law enforcement officers searched the apartment and found four packages of cocaine and eight small baggies of marijuana, along with $921 in cash and a scale. Quinones and his girlfriend were present in the apartment at the time of the search. After being informed of his *Miranda* rights, Quinones gave a written statement to law enforcement officers admitting that the cocaine belonged to him, and stating that he planned to "[u]se it."[1] For reasons not evident in the record, Quinones was apparently not charged or remanded to custody in connection with this November 10 search.

At trial, the government introduced the testimony of Juan Perez–Castro, an alleged leader of the conspiracy. Castro testified that he sold small quantities of cocaine to Quinones for personal use *and* for resale. The government also introduced through Castro's testimony transcripts of several telephone calls between Castro and Quinones, mostly translated from Spanish to English, to evidence Quinones's participation in the alleged conspiracy.

According to Castro's testimony, the "general subject" of a conversation taking place on November 20, 1999—ten days after the search of Quinones's apartment—was that Castro "wanted to see if [Quinones] could get me an ounce ... and [Quinones] was saying here that he had seen it, seen the guy but it wasn't good and the guy was trying to give it to him for $700." The transcript indicates that Quinones said to Castro, "No, no. It's not what you like. I'm going to see if I can rip off the ... the American. I'm going to call him and see if...." According to Castro's trial testimony, Quinones was re-

1. In cross-examining former co-defendant Juan Perez–Castro, who testified against Quinones, Quinones's lawyer attempted show that Quinones bought cocaine only for his own personal use. Castro testified on cross that, "Lazaro [Quinones] would buy like $50 worth, then he'd make three packets of 20 or so, so he could make a little money and save money he was investing in paying me."

ferring in this conversation to cocaine that "wasn't good," and "looked like rocks," and that "since [Castro] didn't like [the cocaine], that maybe he had like an American, a friend he could sell it to cause it was bad stuff." Another exchange in that same conversation translated as follows:

> Quinones: Huh? It was all prepared and everything. About four groups of the shit, man.
>
> Castro: Did you see it?
>
> Quinones: How could I not see it, man? Do you want me to call back?
>
> Castro: Do you have it there?
>
> Quinones: No. He took it with him to break it up.

Castro testified that the two were discussing cocaine.

A transcript from another call between the two the same day shows that Quinones told Castro, "Hey, it's fine now." According to Castro, Quinones was referring to *other* cocaine Quinones had seen. Castro testified of their conversation:

> A. He had shown him one thing and then didn't—wasn't any good then he showed him another thing.
>
> Q. And did Lazaro [Quinones] indicate that this other cocaine was okay?
>
> A. Yeah, he was saying it was good.

The transcript of the conversation itself shows that Castro asked Quinones the price of this cocaine, and that Quinones responded, "I don't know, I didn't ask."

Special Agent James McCormick of the Drug Enforcement Administration testified regarding another monitored conversation in English between Quinones and an unidentified person named "Jim," on November 22, 1999. According to the transcript of that conversation, Quinones told Jim that the "mama" of his "partner" "comes from Florida, you know ah, and they're having a little party over here." Quinones asked Jim if he understood, and Jim said, "Yeah." When Quinones stated that the "party" was then in progress, Jim responded, "My main man, I just got some, so see you tomorrow then." Quinones said, "Oh no. Tomorrow is too late.... It's too late only, only got five gallons." and "If you want we have to do now." Special Agent McCormick explained to the jury that in his opinion, Quinones was telling Jim that a courier had just arrived from Florida with cocaine, and that the reference to "gallons" was to a quantity of cocaine.

With respect to defendant Rodriguez, the government elicited testimony from Hiran Barrera, an indicted co-defendant who pleaded guilty before trial, that, in November, 1999, Barrera had contacted Rodriguez about purchasing cocaine.[2] Ultimately, Barrera bought the cocaine from Rodriguez at $800 per ounce and then resold the cocaine to Castro at $850 per ounce. Barrera also testified that he transported cocaine from Rodriguez to co-defendant Peraza during the relevant time period.

Jorge Izquierdo, another co-defendant who pleaded guilty before trial, also testified that he bought cocaine from Rodriguez on several occasions, sometimes reselling ounce quantities himself. Rafael Peraza, another co-indictee, testified that Rodriguez sold him six ounces of cocaine on one occasion and that he picked cocaine up from Rodriguez's body shop on at least two other occasions. Castro testified that when he contacted Barrera and Peraza looking for a cocaine source, Barrera named Rodriguez as a potential supplier.

---

**2.** The government introduced at trial the translated transcript of this Spanish-language telephone conversation between Rodriguez and Barrera. In the transcript, Barrera refers to four ounces of cocaine as "four complete tires."

According to Castro, Barrera told him that four ounces of cocaine that he was going to sell to Castro were coming from Rodriguez.

On December 8, 1999, the government executed search warrants on various locations associated with the conspirators. One of those locations was the body shop operated by defendant Rodriguez, where officers recovered, near Rodriguez's office, a triple-beam scale, some "cut" (a substance used to adulterate cocaine), and five clear plastic baggies containing cocaine. An officer involved with the surveillance and search testified that there appeared to be very little, if any, legitimate business being conducted at the shop. Rodriguez entered the shop while the search was underway and attempted to flee when the drugs were discovered.

A search of Quinones's residence the same day turned up 1.1 grams of cocaine and a personal phone book containing Rodriguez's telephone numbers.[3] In addition, officers seized a handwritten, anonymous note (in English) from Quinones's house that read in its entirety:

> Lazaro
>
> I'm letting you know you got busted cause you sold to a police informer and they're coming back soon. They'll set you up if they have to. They want you & Sue bad. You being watched.
>
> A friend.

Over Quinones's objection, the district court admitted the anonymous note into evidence.

After a two-week trial, the jury returned a verdict of guilty against Quinones and Rodriguez. The district court sentenced Quinones to 300 months imprisonment, and Rodriguez to 87 months. Each defendant now appeals his conviction.

## DISCUSSION

### A. Sufficiency Of The Evidence

After the government rested, Quinones moved unsuccessfully for a judgment of acquittal under Federal Rule of Criminal Procedure 29. Thereafter, Quinones introduced some photographic exhibits prior to resting his own case. However, as the government points out, Quinones did not renew his motion for judgment of acquittal at the close of all the evidence. Under the law of this circuit, if the defendant moves for a judgment of acquittal at the close of the government's case-in-chief "and defense evidence is thereafter presented but the defendant fails to renew the motion at the close of all the evidence, he waives objection to the denial of his earlier motion, absent a showing of a manifest miscarriage of justice." *United States v. Price*, 134 F.3d 340, 350 (6th Cir.1998) (citations omitted). A manifest miscarriage of justice exists "only if the record is 'devoid of evidence pointing to guilt.'" *Id.* (citation omitted).

Even apart from his apparent wavier, Quinones would face a heavy burden in challenging the sufficiency of the evidence. In reviewing such challenges, we consider "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). To convict Quinones of conspiracy under 21 U.S.C. § 846, "the government was required to prove that there was an agreement to violate the drug laws, and that [the defendant] knew of and voluntarily joined in the conspiracy." *United States v. Price*, 258 F.3d 539, 544 (6th Cir.2001) (citation omitted).

---

**3.** Barrera also testified that Quinones was a some-time visitor to Rodriguez's body shop.

The government need not prove conspiracy by direct evidence. "Drug distribution conspiracies are often 'chain' conspiracies such that agreement can be inferred from the interdependence of the enterprise." *United States v. Bourjaily*, 781 F.2d 539, 544 (6th Cir.1986), *aff'd by* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). In such conspiracies, "[o]ne can assume that participants understand that they are participating in a joint enterprise because success is dependent on the success of those from whom they buy and to whom they sell." *Id.* "Every member of a conspiracy need not be an active participant in every phase of the conspiracy, so long as he is a party to the general conspiratorial agreement." *United States v. Hernandez*, 31 F.3d 354, 358 (6th Cir.1994). And, "[o]nce the conspiracy itself has been proven to exist, it is not necessary to show that a defendant knew every member of the conspiracy or knew the full extent of the enterprise." *United States v. Lloyd*, 10 F.3d 1197, 1210 (6th Cir.1993).

Quinones acknowledges—as he must given the testimony and plea history—that "Castro and the co-defendants" were involved in a conspiracy to distribute cocaine. He argues, however, that the evidence is insufficient to convict *him* of the conspiracy charged in the indictment because, he claims, he was not a co-conspirator, but "one who bought drugs for his own use and sold drugs only for the purpose of recouping the cost of his drugs to himself." Not surprisingly, Quinones cites no authority for the proposition that a seller whose personal motivation for peddling drugs is to finance his own drug habit is exempt from the conspiracy laws. Thus, Quinones's supposed reasons for selling drugs aside, the question is whether the evidence viewed in a light most favorable to the government shows an agreement to distribute cocaine, and that Quinones knew of and joined in that conspiracy.

The evidence shows that Quinones regularly purchased cocaine, albeit in small amounts, from Castro, some of which he turned around and sold. In fact, in executing a search warrant after an undercover buy at Quinones's apartment, police recovered a scale, cash, and four packages of cocaine, tangible evidence that is consistent with distribution. The recorded phone calls in which Quinones remarked to Castro that he could "rip off the American," and in which Quinones told "Jim" that he had "five gallons" in from Florida further support a finding that Quinones had knowingly entered an agreement to sell drugs.[4]

■ It is true that there is very little evidence tying Quinones directly to the other co-defendants charged in the indictment. But, in this "chain"-type conspiracy, the jury could reasonably have presumed that Quinones knew that Castro was engaging others in this interdependent enterprise, as it was obvious that Castro had to obtain his supply from somewhere. Indeed, the taped phone calls show Quinones discussing a potential deal to supply Castro, *his* usual supplier, with a quantity of cocaine. In addition, the government introduced evidence that Quinones's phone book included Rodriguez's phone number, and that Quinones was a visitor to Rodriguez's body shop, which, according to the government, was primarily a front for illegal activities. Given that "it is not necessary to show that a defendant knew every member of the conspiracy

---

4. Quinones repeatedly argues that the government "misjudged" the intercepted phone calls. (Quinones Br. at 21–24) The question, however, is not whether the government misinterpreted the calls, but whether the jury could have rationally found Quinones guilty beyond a reasonable doubt based upon all the evidence in the record.

or knew the full extent of the enterprise," *Lloyd*, 10 F.3d at 1210, the evidence of Quinones's involvement in the conspiracy was sufficient.

Quinones suggests that his case is analogous to *United States v. Gibbs*, 182 F.3d 408 (6th Cir.1999). In *Gibbs*, the government charged with conspiracy members of a loose group of drug dealers, alleging that they had conspired to control the distribution of cocaine in a local area by excluding non-local drug dealers. This court vacated the convictions of several of the defendants because, even though the government proved that they had sold drugs in the area during the relevant time period, there was no proof that they agreed to participate in the charged conspiracy, which necessarily involved excluding outsiders. *See id.* at 423. The government counters that *Gibbs* is inapposite because here, unlike in *Gibbs*, the government charged "a typical conspiracy to possess cocaine with intent to distribute." Quinones has not identified any aspect of the basic conspiracy charged in this case for which the jury had no basis to infer his involvement. We agree with the government that there was sufficient evidence for the jury to conclude that Quinones was part of the overarching conspiracy charged by the government.

Rodriguez also argues that the government failed to show his personal knowledge of or involvement in a conspiracy "beyond simple seller and purchaser transactions." According to Rodriguez, the evidence merely showed that the defendants "were all simply Cuban immigrants who happened to know one another and sometimes sold drugs." Although Rodriguez made a Rule 29 motion at trial, that filing challenged only the amount of cocaine involved in the conspiracy, not the sufficiency of the evidence supporting an agreement. Thus, it is not clear that Rodriguez has preserved this argument for appeal,

beyond review for a manifest miscarriage of justice. Even assuming it has been preserved, however, the claim fails on its merits.

■ As explained in the analysis of Quinones's similar assertion of error, the government's evidence supported a finding that the defendants engaged in a "chain"-type conspiracy to distribute cocaine. Trial testimony showed that Rodriguez was heavily involved in the activities of the group, supplying cocaine to various members of the conspiracy, some of whom, in turn, supplied the drug to others. Further, law enforcement officers recovered a triple-beam scale, cocaine, and a cocaine adulterant in the body shop Rodriguez operated, Rodriguez attempted to flee when those items were discovered, and Quinones's phone book included Rodriguez's phone numbers, including that of the body shop. Viewed in a light most favorable to the government, this evidence is more than sufficient to support the jury's verdict.

### B. Variance Between Evidence And Indictment

Consistent with their argument regarding the sufficiency of the evidence, the defendants also argue that their convictions must be vacated because the evidence at trial did not prove their participation in the conspiracy alleged in the indictment. For example, Quinones contends that, although the evidence may have shown that he and his (unindicted) girlfriend were involved in a smaller drug distribution conspiracy among themselves, it does not show his participation in the so-called "Castro conspiracy" that was charged in the indictment.

"A variance occurs when the proof introduced at trial *differs materially* from the facts alleged in the indictment." *United States v. Beeler*, 587 F.2d 340, 342 (6th Cir.1978) (emphasis added). In order to

obtain a reversal due to a variance between the indictment and the proof, the defendant must (1) demonstrate the variance and (2) show that the variance affected some substantial right. *See United States v. Kelley*, 849 F.2d 999, 1002 (6th Cir.1988).

Here, the indictment set forth a general agreement among eight co-conspirators to possess with intent to distribute 500 grams or more of cocaine. As explained above, when viewed in a light most favorable to the government, and given the case law regarding what is and is not necessary to prove a conspiracy, the evidence supports a finding that the defendants knowingly participated in a single conspiracy, with Castro taking a leading role, to possess cocaine with intent to distribute. A fatal variance between the evidence and proof results "[w]here an indictment alleges one conspiracy but the evidence can be construed as *only* supporting a finding of multiple conspiracies." *United States v. Lee*, 991 F.2d 343, 349 (6th Cir.1993) (emphasis added). That is not the case here. Thus, for the same reasons that we have rejected the defendants' evidentiary sufficiency claim, we find that this claim is also without merit.

### C. Refusal To Instruct Jury On Multiple Conspiracies

The defendants requested that the district court give instructions to the jury on multiple conspiracies. The district court sustained the government's objection to the request and declined to give the suggested instructions, stating:

> The Court finds that there is certainly evidence on this record, as there is in almost every [c]onspiracy case, of many different individual acts and some variation in the complicity of various participants in the conspiracy. However, I find that there is no evidence of multiple

conspiracies. To the extent that there is evidence of conspiracy, the evidence is of a single conspiracy involving multiple participants in different ways aimed at the same result; that is, the acquisition and distribution of cocaine.

The defendants argue on appeal that this ruling was in error and that the error constitutes grounds for a new trial. We disagree.

"[W]hen the evidence is such that the jury could within reason find more than one conspiracy, the trial court should give the jury a multiple conspiracy instruction." *United States v. Warner*, 690 F.2d 545, 551 (6th Cir.1982). It is possible for the same set of facts to support both a finding of a single conspiracy and a finding of a multiple conspiracy. *See United States v. Davenport*, 808 F.2d 1212, 1217 (6th Cir.1987) ("Although we have decided that there was adequate basis for finding a single conspiracy, there was also proof that might support multiple conspiracies."). A district court's "refusal to deliver a requested instruction is reversible only if that instruction is (1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense." *United States v. Frost*, 125 F.3d 346, 372 (6th Cir.1997) (citations omitted).

As discussed, this case involved a drug-chain conspiracy. We have acknowledged that in such cases "it is not easy for a defendant to succeed in making a multiple conspiracy claim." *United States v. Maliszewski*, 161 F.3d 992, 1014 (6th Cir.1998). For instance, defendant Quinones is less than clear about the contours of the multiple conspiracies that he claims are shown by the evidence. Moreover, it is difficult to understand how the jury could have found an agreement between only Qui-

nones and his girlfriend, given the extensive evidence of the defendant's dealings with Castro. On this basis alone, therefore, we do not fault the district court for refusing to give the requested instruction.

■ Even assuming the court erred in this regard, the error did not prejudice Quinones. In a number of cases, we have held that, in instances where the evidence could support a finding of multiple conspiracies, failure to give a multiple conspiracy instruction did not warrant reversal as long as the jury was adequately instructed that it could convict the defendant only of the conspiracy *charged in the indictment*. *See, e.g., Davenport*, 808 F.2d at 1217 (finding adequate basis to support multiple conspiracy instruction but no plain error where "jury instructions sufficiently informed the jury that it could only convict the defendant for a conspiracy alleged in the indictment of which he was a part") (quotation omitted).

We conclude that the instructions in this case, as a whole, obviate any possible error in the district court's refusal to instruct the jury on multiple conspiracies. After reading the indictment to the jury, the district court instructed, "I want to emphasize that each Defendant is on trial only for the particular crime charged in the Indictment. Your job is limited to deciding whether the Government has proved the crime charged." The court further explained:

> Count One of the Indictment accuses each Defendant, as well as others, of a conspiracy. Specifically, this is claimed to be a conspiracy to commit the crime of either possessing with intent to distribute or distributing cocaine in violation of Federal law....
>
> So for you to find a defendant guilty of the Conspiracy charge, the Government, that is the evidence, must prove both of

the following essential items or ingredients beyond a reasonable doubt.

> First, that two or more persons conspired or agreed to commit the crime of either possessing with intent to distribute or distributing cocaine.
>
> Second, that the Defendant under review knowingly and voluntarily joined the conspiracy intending to help, advance or achieve its goal and that's it. You must be convinced that the Government through the evidence has proved both of these things beyond a reasonable doubt to find that the Defendant guilty [sic] of the Conspiracy charge.

> \*   \*   \*   \*   \*   \*

> There is no requirement that a particular defendant be enter [sic] connected with all the other co-conspirators nor that he be specifically connected with some other particular co-conspirator. Really, it is the conspiracy itself to which a defendant must be connected beyond a reasonable doubt."

> \*   \*   \*   \*   \*   \*

> [J]ust because the defendant may have done something that happened to help a conspiracy, does not necessarily make him a conspirator. Now you can consider these things in deciding if the Government has proved that the defendant joined the conspiracy, but without more, they would not be enough.

> What the Government must prove is that the defendant knew the conspiracy's main purpose and that he voluntarily joined it intending to help, advance or achieve the goals of the conspiracy. That is essential. The Defendant's knowledge, in other words his intent, his state of mind can be proved indirectly by facts and circumstances from—or which rather—which lead to a conclusion that he knew the conspiracy's main purpose. But it is up to the government to

convince you that such facts and circumstances existed in this particular case.

\*     \*     \*     \*     \*     \*

So in short, whether or not a defendant has been proven beyond a reasonable doubt to have been a member of the conspiracy may be determined by you based upon reasonable conclusions drawn from all of the evidence in the case.

\*     \*     \*     \*     \*     \*

So in other words, the particular motive for distribution is not important in deciding whether distribution of cocaine was the goal or was intended by this particular conspiracy that's been alleged in the Indictment.

\*     \*     \*     \*     \*     \*

Generally a person whose only involvement with a conspiracy was obtaining drugs for his own personal use may not be convicted of a Conspiracy to Possess with Intent to Distribute or to distribute those drugs. If there is additional evidence, however, beyond the mere purchase of drugs from which you conclude beyond a reasonable doubt that the purchaser had knowledge of the conspiracy and voluntarily joined intending to assist its goals, then a conspiracy conviction may be warranted.

These excerpts indicate that the jury was focused on the particular conspiracy charged. In addition, the verdict forms required the jury to indicate its finding of guilt on the sole count "as charged in the indictment." Although the district court could have been more explicit on this point, we do not believe the jury could have been confused about which conspiracy was at issue. Accordingly, the defendants are not entitled to a new trial on this ground.

### D. Admissibility of Anonymous Note Under Fed.R.Evid. 801(d)(2)(D).

Prior to trial, defendant Quinones filed a motion *in limine* seeking exclusion from evidence of the anonymous note purporting to warn Quinones that the government was hot on his trail. According to Quinones, the note was "pure hearsay" and could not be admitted under any hearsay exception because the government could not identify its author, when it was written, or for what purpose. In response, the government urged that the note was admissible under Federal Rule of Evidence 801(d)(2)(E), which governs the admissibility of out-of-court statements by co-conspirators made in furtherance of the conspiracy. According to the government, an inference could be drawn that the author of the note was a co-conspirator, given that the note was "an accurate reflection of what actually happened" and that its "sole function" was to warn Quinones so he could avoid being caught.

Prior to trial, the district court ruled that the note was admissible as a statement of a co-conspirator in furtherance of the conspiracy:

Well, it seems to me from the content in and of itself this person, whoever the author was, was volunteering to make himself a member of the conspiracy, apparently knew what was going on and I would say the definition of conspiracy fits here. This is the author of this note[,] knowing what was going on, knowing that there was illegal activity ... afoot, voluntarily joined the conspiracy to help advance or achieve its goals in some part, that is to assist a perpetrator in the conspiracy.... It seems to me that there is a reasonably clear indication from the contents of the note itself that its author was in fact or was attempting to become a member of the conspiracy and not for any particular

profit, motive or anything of that nature. Perhaps it was misplaced altruism, but the motive for becoming involved in a conspiracy is not important.... It seems to me that this note author is a co-conspirator and that this is a co-conspirator statement under 801(d)(2)(E). Whether the person is identified or not certainly is unimportant. It's not an essential element of the conspiracy to be identified.

Quinones argues on appeal that the district court erred in finding the note admissible under Rule 801(d)(2)(E), and that the error entitles him to a new trial. Quinones contends that an anonymous statement cannot be admissible under Rule 801(d)(2)(E), that admission of the statement violated his rights under the Sixth Amendment's Confrontation Clause, and that the statement was admitted before the court determined that a conspiracy existed.

Rule 801(d)(2)(E) provides that a statement is "not hearsay" if it is made by "a coconspirator of a party during the course and in furtherance of the conspiracy." In order to admit a co-conspirator statement, the government must establish by a preponderance of the evidence that: (1) a conspiracy existed, (2) the defendant was a member of the conspiracy, and (3) the co-conspirator's statements were made in furtherance of the conspiracy. *See United States v. Pierce,* 62 F.3d 818, 827 (6th Cir.1995). The district court's determination of these facts is reviewed for clear error, *see id.,* but its ultimate legal conclusion is reviewed *de novo, see Maliszewski,* 161 F.3d at 1007.

■ Contrary to defendant Quinones's assertion, the statement of an unidentified declarant is not *per se* inadmissible under Rule 801(d)(2)(E). *See e.g., United States v. Breitkreutz,* 977 F.2d 214, 219 (6th Cir. 1992) (anonymous statement held to be admissible where there was "ample circumstantial evidence" of a conspiracy involving the declarant and the defendant, and the statement was made in furtherance of that conspiracy). Here, the contents of the note, *combined with* the circumstances in which it was found, and other evidence put forth by the government, support the district court's conclusion that it was authored by a co-conspirator in furtherance of the conspiracy. The note, recovered from Quinones's residence on December 8, 1999, was addressed to Quinones, and accurately referenced a prior sale by Quinones to an undercover informant. The government, of course, offered evidence of Quinones's November 10 sale to such an informant. The author of the note presciently warned Quinones that he was "being watched," and that authorities were "coming back soon." The district court apparently concluded that this warning from a "friend" was designed to further the aims of the conspiracy by causing Quinones to conduct his illegal activities with greater caution. This factual finding does not appear to be clearly erroneous.

Further, Quinones's argument that admission of the note violated the Confrontation Clause lacks merit. In making this argument, Quinones cites only one case, *Ohio v. Roberts,* 448 U.S. 56, 65, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). There, the Supreme Court set forth a two-part test for determining, in general, whether the admission of hearsay violates the Confrontation Clause. Under that test, for hearsay to be admissible, (1) the declarant must be unavailable, and (2) the hearsay statement must bear adequate "indicia of reliability." *Id.* However, as this court recently observed, "[t]he Supreme Court has determined that if the out-of-court declarant is a *coconspirator* of the defendant, the prosecution need not establish the unavailability of the declarant, *United States*

*v. Inadi,* 475 U.S. 387, 391, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986), or the reliability of his statements, *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144, (1987)." *Anthony v. DeWitt,* 295 F.3d 554, 561 (6th Cir.2002) (parallel citations omitted) (emphasis added). Accordingly, we find no Sixth Amendment violation in this prosecution.

█ Finally, we conclude that Quinones's argument that the district court erred by ruling on the note's admissibility before the government had adduced evidence of the conspiracy is baseless. We have held repeatedly that it is permissible for the district court to admit the challenged statements conditionally, subject to later demonstration by the government that the requirements of Rule 801(d)(2)(E) have been satisfied. *See, e.g., United States v. Barrett,* 933 F.2d 355, 358 (6th Cir.1991). It appears that this is what the district court did here, noting after the close of the government's case that it was satisfied that the government had established proof of a conspiracy, and that previously-admitted "statements conceivably challengeable under hearsay would be admissible because they were statements of co-conspirators made in furtherance of the conspiracy and in the course of the conspiracy."

In sum, defendant Quinones has failed to show that the district court erred in denying his motion *in limine* to exclude the anonymous note. Further, we conclude that any error in this regard would have to be considered harmless at most, because there was ample evidence of Quinones's participation in the conspiracy and the note played little part in the government's case.

### E. Motion To Suppress Fruits Of Authorized Wiretap

Defendant Rodriguez filed a motion *in limine* to suppress the fruits of a wiretap authorized in November 1999 by Judge John Corbett O'Meara, pursuant to 18 U.S.C. § 2518. The authorization was supported by a 52–page affidavit by Special Agent McCormick. According to Rodriguez, the supporting affidavit established neither probable cause nor the necessity required under federal law to justify a wiretap. The district court denied the motion and Rodriguez now contends that the determination was in error.

The wiretap authorization at issue here covered three telephone lines, but Rodriguez's challenge on appeal concerns only the line at 2017 Lawndale, Detroit. The subscriber of that line was Rafael Peraza, a co-defendant who ultimately pleaded guilty to conspiracy charges. Special Agent McCormick's affidavit provided the following information relating specifically to that address and to Peraza himself:

• Rafael Peraza, subscriber of the Lawndale phone line, had a previous conviction for conspiracy to distribute cocaine.

• Rafael Estrada, another co-defendant who ultimately pleaded guilty, was observed at the Lawndale address shortly after selling cocaine to an undercover officer in August, 1999. (Estrada was the owner of the house.)

• Local police investigating drug trafficking had indicated that the Lawndale address was a "clearing house" for drug transactions.

• Pen register data for one of the other targeted phone lines (a cellular phone) on August 26, 1999 showed that Estrada made several calls to the Lawndale line while negotiating the sale of cocaine to an undercover officer. Upon completing one such call, Estrada told the undercover officer what the price would be.

In addition, the affidavit shows that the line at Lawndale was in frequent contact with one of the other targeted phone lines, for which probable cause has not been specifically challenged.

In reviewing the propriety of an application for authorization of a wiretap on appeal, we are required to judge the evidence "on the totality of the circumstances and in a reasonable and common sense manner." *United States v. Alfano*, 838 F.2d 158, 161 (6th Cir.1988). "Since the issuing judge is in the best position to determine all of the circumstances in the light in which they may appear at the time, 'great deference' is normally paid to the determination of an issuing judge." *United States v. Giacalone*, 853 F.2d 470, 478 (6th Cir.1988).

■ The government argues, and we agree, that there is no basis to disturb the issuing judge's conclusion with respect to probable cause in this case. The affidavit showed that the Lawndale address itself was a center of drug activity *and* that the phone line was used in the negotiation of a drug transaction between the owner of the house and an undercover officer. The occupant of the house and subscriber of the phone line was himself a convicted cocaine conspirator. Finally, the affidavit provided ample support for a finding of probable cause with respect to the other targeted phones, and pen register data showed that the Lawndale address was in frequent contact with at least one of those phones. Viewed as a whole, the affidavit clearly supported a finding of probable cause for a wiretap at the Lawndale address.

Rodriguez also contends that the affidavit failed to support a finding, as required by statute, that "other investigative procedures have been tried and failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). Rodriguez characterizes Agent McCormick's representations about the need for a wiretap authorization as "conclusory" and "self-serving."

The requirement of § 2518(3)(c) "was placed in the statute to ensure that a wiretap is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *Alfano*, 838 F.2d at 163 (internal quotation omitted). "However, the government is not required to prove that every conceivable method has been tried and failed or that all avenues of investigation have been exhausted." *Id.*

Upon review of the affidavit, we conclude that it is adequate to meet the so-called "necessity" prong. Agent McCormick set forth in sufficient detail how alternative investigative methods had proven insufficient to identify the conspirators and uncover the scope of the criminal enterprise. It follows that the wiretap was properly authorized and that the district court did not err in declining to suppress the fruits of its execution.

### CONCLUSION

We have reviewed the record and the issues raised on appeal, including a frivolous claim by defendant Rodriguez that the district court unfairly restricted his cross-examination of one of the government's witnesses, Jorge Izquierdo. We conclude that there are no meritorious grounds for retrial, and we therefore AFFIRM the judgment of the district court as to both defendants.