RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0118p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

─────────────────

JERRY LYNN BALES,

*Petitioner-Appellant,*

*v.*

THOMAS BELL, Warden,

*Respondent-Appellee.*

No. 13-2404

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:10-cv-13480—Denise Page Hood, District Judge.

Argued: December 3, 2014

Decided and Filed: June 10, 2015

Before: SILER, SUTTON, and STRANCH, Circuit Judges.

─────────────────

**COUNSEL**

**ARGUED:** Frank D. Eaman, FRANK D. EAMAN, PLLC, Detroit, Michigan, for Appellant. Andrea M. Christensen, OFFICE OF THE ATTORNEY GENERAL OF MICHIGAN, Lansing, Michigan, for Appellee. **ON BRIEF:** Frank D. Eaman, FRANK D. EAMAN, PLLC, Detroit, Michigan, for Appellant. Andrea M. Christensen, OFFICE OF THE ATTORNEY GENERAL OF MICHIGAN, Lansing, Michigan, for Appellee.

─────────────────

**OPINION**

─────────────────

SILER, Circuit Judge. Petitioner Jerry Bales appeals the district court's denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254. For the following reasons, we **AFFIRM**.

**FACTUAL AND PROCEDURAL BACKGROUND**

Jerry and his wife Linda were godparents to their niece Whitney G., the victim in the underlying state criminal case. Whitney often stayed overnight with Jerry and Linda on weekends and accompanied the couple on camping trips. When Whitney was around twelve years old, Linda and Jerry began divorce proceedings. During that time, Linda told Whitney's parents that Linda's adult daughter-in-law, Jennifer S., had accused Jerry of making sexual advances toward her. Notably, Jennifer did not testify at Jerry's trial. Linda told Whitney's mother, Tamra G., that Linda was concerned about Whitney.

Tamra, Tamra's husband, and Linda discussed Linda's concern for Whitney. Tamra later asked Whitney if Jerry had ever touched her "in a way that an uncle shouldn't have." Whitney started crying and said that Jerry had done something to her, but she made no specific allegations. Thereafter, Whitney told her mother what had happened between her and Jerry. The state charged Jerry with two counts of second-degree criminal sexual conduct and one count of assault with intent to commit second-degree criminal sexual conduct.

Jerry was tried in 2005, but the jury was unable to reach a verdict. At the retrial, Whitney testified that Jerry touched her inner thighs and genital area while they were alone at Jerry and Linda's home. Jerry told Whitney not to tell anyone. Although Whitney had difficulties remembering some details, she eventually testified that Jerry also grabbed her wrist and moved her hand toward his penis. She testified further that Jerry told inappropriate jokes and used to tell her she had a nice body. Whitney remembered that Jerry exposed himself in front of her on one occasion. Although this was a new allegation since the previous trial, she explained that her memory had improved.

Tamra also testified at trial and confirmed the close relationship between Jerry and Whitney. Linda also corroborated the relationship between Jerry and Whitney and testified that Jerry particularly favored Whitney. She explained that her son's wife, Jennifer, had told her some disturbing things about Jerry, which prompted Linda to contact Whitney's parents out of concern for Whitney. Linda further testified about Andrea S. After Jerry was charged with crimes against Whitney, Linda contacted Andrea's father, which prompted Andrea to speak out

for the first time. Linda admitted she had never seen Jerry act inappropriately toward Whitney or Andrea.

Andrea, who was twenty-six years old at the time of trial, testified as an other acts witness. She testified that Jerry often commented on her body when she was a young girl. When Andrea was about twelve years old, she went with Linda and Jerry on a road trip to Georgia to watch Jerry's son graduate from military school and to New Orleans for Mardi Gras. The night before they departed for the road trip, Andrea spent the night at Jerry's home. She testified that Jerry came into her room several times throughout the night; when he did, he exposed his penis and touched her body. At one point, Jerry was on top of Andrea, and she testified that something was inserted into her vagina. While the trio was on the road trip, Jerry sometimes touched Andrea and made lewd comments. Andrea testified that while staying in New Orleans, Jerry did "the same things [to Andrea] . . . that happened" the night before the group left for the road trip. After the road trip, Jerry continued to visit Andrea and gave her jewelry and gifts. Sometimes Jerry would wait for Andrea at her home or pick her up from school. The last time Jerry attempted to see Andrea, he broke into her home, and Andrea ran off into the woods. Andrea testified that Jerry and Linda then visited less frequently and stopped visiting in 1994 or 1995. On cross-examination, Andrea acknowledged inconsistencies in her testimony between the two trials but explained that she had tried to forget about the experience over the years.

At trial, Jerry denied all of Whitney's accusations. He testified that on Whitney's last visit to his home, he yelled at her because she had disobeyed him by going swimming in the pool and had tracked water onto the carpet. Jerry acknowledged that he and Whitney spent a lot of time alone together. He also denied Andrea's accusations and testified that it was Linda's idea to bring Andrea on the road trip to see their son's military graduation. He did not recall spending time alone with Andrea or going to Andrea's home. Jerry's theory of the case was that Linda and others had conspired to get him charged with a crime so that Linda could benefit during the divorce proceedings.

During the trial, the prosecutor and defense counsel fought openly, often making side comments or tagging inappropriate remarks onto questions while examining witnesses. When the prosecution rested its case, defense counsel moved for a mistrial, citing prosecutorial

misconduct. After the court denied his initial motion, defense counsel again moved for a mistrial after closing arguments. The court again denied the motion and repeatedly instructed the jury during trial that the attorneys' comments were not evidence.

The jury found Jerry guilty of two counts of second-degree criminal sexual conduct but not guilty of assault with intent to commit second-degree criminal sexual conduct. The trial court sentenced Jerry to four to fifteen years imprisonment. The Michigan Court of Appeals affirmed his convictions and sentence. The Michigan Supreme Court denied his application for leave to appeal.

Next, Jerry began a collateral attack on his conviction and moved the trial court for relief from judgment, arguing that the prosecutor had failed to disclose certain exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The trial court denied his motion. The Michigan Court of Appeals and the Michigan Supreme Court both denied his application for leave to appeal. *People v. Bales*, 783 N.W.2d 121, 121 (Mich. 2010).

Thereafter, Jerry filed this habeas petition pursuant to 28 U.S.C. § 2254. The district court denied his petition but granted a certificate of appealability as to two of Jerry's claims: whether the prosecutor failed to turn over certain evidence under *Brady* that would show that key prosecution witnesses were lying at trial and whether he was denied due process due to prosecutorial misconduct. *Bales v. Bell* (*Bales II*), No. 2:10-CV-13480, 2013 WL 5539592, at *19 (E.D. Mich. Oct. 8, 2013).

## STANDARD OF REVIEW

The parties agree that the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d), applies. It states in relevant part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court *shall not* be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was *contrary to*, or involved an *unreasonable application* of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an *unreasonable determination of the facts* in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added); *see Davis v. Lafler*, 658 F.3d 525, 530 (6th Cir. 2011).

## DISCUSSION

## I. *Brady* Violation

Jerry asserts that he is entitled to habeas relief because the prosecutor failed to disclose certain evidence, including: (1) a nine-page Huron Township police report dated 2/9/05 with supplements through 3/1/05 concerning Andrea's allegations that Jerry sexually assaulted her when she was a child; (2) handwritten notes by Andrea's therapist that Andrea had given to the police; and (3) handwritten police notes from an interview with Jennifer. Jerry argues that the failure to disclose this evidence is a clear due process violation under *Brady*, 373 U.S. 83 at 87.

## 1. Procedural Default[1]

When considering Jerry's habeas petition, the district court declined to embark on a procedural-default analysis. Indeed, federal courts on habeas review "are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003). We likewise decline to address the procedural default issue and will proceed directly to the merits of Jerry's *Brady* claim. *See Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (noting that judicial economy may favor addressing the merits rather than seeking to resolve complicated issues of state law).

---

[1]The claims asserted by the warden concerning the procedural default of both Jerry's *Brady* and prosecutorial misconduct claims are likely without merit. As Jerry argues in his briefs, the state court reached a decision on the merits that we review here with AEDPA deference. We avoid the procedural default issues solely for purposes of judicial economy.

## 2. Merits of the *Brady* Claim[2]

Under *Brady*, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is *material* either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87 (emphasis added).

We will assume, without deciding, that the evidence at issue was suppressed and will proceed to evaluate whether the evidence was favorable and material.

### a. Evidence Concerning the Other Acts Witness

Jerry argues that two pieces of related evidence concerning Andrea were suppressed: (1) the Huron Township Police Report—which consists of typed police notes from an interview with Andrea—and (2) a short, hand-written set of notes from Andrea's therapist. Jerry argues this evidence would have demonstrated a number of inconsistencies in Andrea's trial testimony. The police report indicates Andrea was nine years old during the road trip she took with Linda and Jerry, while the therapist notes suggest she was ten or eleven, and at trial, Andrea testified she was twelve. Further, there were inconsistencies concerning whether Jerry had a key to Andrea's home. Andrea's testimony at trial and the police report indicate that Andrea told a neighbor about Jerry's abuse, but the police report identifies the neighbor Andrea told was Leah Ratti, who, when interviewed by police, could not recall such a conversation.

We agree with the warden that the inconsistencies in Andrea's statements fall short of "demonstrat[ing] conclusively that her stories were continually changing and concocted," as Jerry claims in his brief. Whether Jerry had a key to Andrea's home is tangential to her claim that Jerry waited for her at her home after school. Whether she told her neighbor about the abuse is also of little direct relevance. The police report indicates that Andrea "*may* have told a next-door neighbor about what [Jerry] was doing to her, the neighbor's name is Leah Ratti." (Emphasis added.) When the police followed up with Ms. Ratti, she could not recall such a conversation. However, Andrea told police she "had briefly confided in a friend named Sara

---

[2]After oral argument, Jerry submitted a letter, which cited *Gumm v. Mitchell*, 775 F.3d 345 (6th Cir. 2014), as additional authority in support of his habeas petition. However, *Gumm* is factually and legally distinct from the issues in this case. In *Gumm*, ADEPA deference did not apply because the state court determined it did not have jurisdiction over the petitioner's *Brady* claim. *Id.* at 362. Moreover, the suppressed evidence in *Gumm* was material, and included evidence that police had other legitimate suspects and evidence that would serve to undermine the State's theory of the case. *Id.* at 364–69.

Suemnick" about the abuse. When the police investigated, Sara did recall such a conversation with Andrea. Additionally, the therapist notes are vague and would have provided little assistance to Jerry or the prosecutor. The police report is more damning to Jerry's case than helpful. Consistent with Andrea's testimony, the police report discusses Andrea's road trip with Linda and Jerry and indicates that Jerry assaulted her in the car and in the motel in New Orleans; it also indicates that after the road trip, Jerry would wait for Andrea when she got home from school.

The most significant inconsistency brought to light through the police report and therapist notes was Andrea's reported age during the road trip she took with Jerry and Linda. However, the discrepancy in Andrea's reported age (between nine and twelve) is relatively slight. Because the police report and therapist notes would provide some impeachment value, however small, we will proceed to the last question in the *Brady* analysis—whether the suppression was prejudicial to Jerry. *See Strickler v. Greene*, 527 U.S. 263, 281–82 (1999) (noting favorable evidence is favorable either because it is exculpatory or because it is impeaching).

"'[W]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material.'" *Byrd v. Collins*, 209 F.3d 486, 518 (6th Cir. 2000) (quoting *United States v. Avellino*, 136 F.3d 249, 257 (2d Cir. 1998)). Here, defense counsel cross-examined Andrea extensively at trial and impeached her with her testimony from the prior trial. Defense counsel also asked questions intended to highlight the implausibility of some of Andrea's testimony. While Andrea's age during the road trip was never particularly challenged, defense counsel attempted to challenge Andrea's credibility and show that she had changed her story. Showcasing that Andrea made inconsistent remarks regarding her age during the road trip with Jerry would not create "a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. at 281. Indeed, even without cross-examination on the subject, Andrea struggled at trial to recall her age during the road trip, stating "I'm going with [I was] twelve, I believe . . . I can't really remember." The undisclosed evidence would have merely emphasized that Andrea struggled to recall how old she was during

the road trip, but it would, by no means, cause one to lose confidence in the jury's verdict. *See Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

### b. Evidence Concerning Jennifer

Next, Jerry argues that the nondisclosure of "police notes on the interview with Jennifer . . . were even more important to the defense." In his brief, Jerry maintains that the notes from the police interview with Jennifer, who did not testify at trial, would show that Linda "concocted a story and then went to W[hitney's] family in an attempt to get W[hitney] to make allegations against Jerry to assist in her divorce." Essentially, Jerry believes the police notes would prove his theory of the case: that Linda lied to benefit during the divorce and that Jerry had made inappropriate advances only toward Jennifer, when she was an adult. But this logic is several steps removed from what the notes themselves indicate. The police notes establish who Jennifer is and that Jerry purportedly made several inappropriate advances toward her, including: telling her she had "nice legs when wearing a skirt," commenting on knowing where she had been throughout the day, calling Jennifer's home and speaking only if she answered, and offering "to meet her in the work parking lot."

Jerry's argument centers on one line of the police notes, which states that Jennifer "told [her husband] who had a conversation w[ith] Jerry[. Jennifer] was then accused of coming onto Jerry by Linda." Jerry believes that this establishes that Linda knew of Jerry's inappropriate behavior toward Jennifer long before the divorce proceedings. Therefore, the argument goes, Linda falsely testified that she learned of Jerry's advances toward Jennifer for the first time when the divorce was initiated; further, Linda was also lying about her reason for contacting Whitney's parents, which sparked the entire case.

At trial, Linda testified that Jennifer told her some "disturbing" information about Jerry, which prompted Linda to contact Whitney's parents. Linda's testimony at trial was *not* that the information about Jennifer was "new" per se, although that fact could reasonably be implied. However, even if such evidence undermines Linda's testimony, Jerry does not bother to explain how the document would have been admissible or even helpful at trial, except to "impeach" Linda. Yet, Linda could not be impeached by Jennifer's statements, and "withheld information

is material under *Brady* only if it would have been admissible at trial or would have led directly to admissible evidence." *See Gumm*, 775 F.3d at 363.

Furthermore, defense counsel could have questioned Linda about whether Jennifer's allegations were new at the time she and Jerry began their divorce.[3] Instead, defense counsel questioned Linda's motives, without questioning the *timing* of Jennifer's accusations. In any event, the single line from the police notes does not rise to the level of being "material" because there is no "reasonable probability that," had the police notes been disclosed to Jerry, "the result of the proceeding would have been different." *Strickler*, 527 U.S. at 280. The very fact that defense counsel could have asked Jerry or Linda about whether Jennifer's accusations were new, but chose not to do so, indicates that the evidence is not material for *Brady* purposes. Moreover, Linda was cross-examined extensively about her true motives, and any further questioning would have been cumulative so as to render it immaterial. *See Byrd*, 209 F.3d at 518. Finally, the police notes could have harmed Jerry more than they would have harmed Linda's credibility because the notes would highlight a third woman to have made accusations against Jerry for his alleged inappropriate behavior.

### c. Cumulative Effect

Considering all three pieces of undisclosed evidence collectively still does not help Jerry's plight because the undisclosed evidence, even considered together, does not rise to the level of being "material" for purposes of a *Brady* violation. All three pieces of evidence were damning to Jerry's case, in that they corroborated Andrea's testimony and described accusations made by Jennifer.[4] What little assistance the evidence could have provided to Jerry (if any at all) was eclipsed by its usefulness to the prosecution. Even if Jerry could have been successful in only using the helpful components of the evidence, while somehow avoiding the negative aspects, the evidence would have been cumulative and certainly does not give us reason to question our "confidence in the outcome of the trial." *Kyles*, 514 U.S. at 434. In sum, the state court's decision that the withheld evidence was "not material and there is not a reasonable

---

[3]The notes indicate Jerry knew about Jennifer's allegations. Accordingly, Jerry and defense counsel were equipped with the information contained in the police notes.

[4]Notably, Jennifer's accusations were quite underplayed and barely mentioned at trial. The police notes concerning her interview would only serve to highlight Jennifer's accusations.

probability that the outcome of the trial would have been different" is not contrary to Supreme Court precedent.

## II.  Prosecutorial Misconduct

Jerry next asserts that the state court's determination that the prosecutor's conduct did not deny Jerry a fair trial was an unreasonable application of clear Supreme Court precedent and an unreasonable determination of the facts.

### 1.  Procedural Default

On habeas review, the district court quoted the Michigan Court of Appeals at length and determined that the "state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts."   The district court again bypassed procedural default and chose to resolve the issue on the merits.  We follow suit.  *See Hudson*, 351 F.3d at 215 ("The U.S. Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits.").

### 2.  Merits of Prosecutorial Misconduct Claim

The questions here are: (1) whether the trial was "so infected . . . with unfairness as to make the resulting conviction a denial of due process," *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *see also Parker v. Matthews*, 132 S. Ct. 2148, 2153, 2155 (2012) (per curiam) (confirming that this is the standard used on habeas review); and (2) whether the state court's ruling that "the prosecutor's conduct was not so egregious that [Jerry] was denied a fair trial" was contrary to that standard.  *Bales*, 2007 WL 1203536, at *2.  Jerry asserts two general sets of prosecutorial misconduct: attacks against Jerry himself and attacks against defense counsel.

Jerry identifies a number of prosecutorial "attacks" against Jerry that he believes warrant habeas relief.   Jerry maintains that the prosecutor attacked Jerry on cross-examination by suggesting Jerry was changing his testimony.  After a round of back and forth between Jerry and the prosecutor at trial, the prosecutor asked, "So what is your testimony today at 10:01 about that —" to which defense counsel objected at trial.  The objection was sustained.   Jerry also argues that the prosecutor solicited evidence that Jerry told rude and dirty jokes in front of

children. Jerry was apparently upset after viewing photos at trial, and on cross-examination, the prosecutor asked Jerry, "When you cry, do you normally cry tears?" Defense counsel made no objection. Jerry also complains that the "prosecutor was allowed, over objection of defense counsel, to ask [Jerry] on cross examination if he ever went to married women's houses by himself." However, a review of that question in the record reveals that the prosecutor asked Jerry whether he had ever been to Andrea's mother's house by himself, and Jerry responded that he would not go to a married woman's house without her husband there.

As an initial matter, the trial court found that many of these statements were relevant to the trial, and a "prosecutor may rely in good faith on evidentiary rulings made by the state trial judge and make arguments in reliance on those rulings." *Cristini v. McKee*, 526 F.3d 888, 900 (6th Cir. 2008). Further, "[w]hen a defendant assumes the role of a witness, the rules that generally apply to other witnesses—rules that serve the truth-seeking function of the trial—are generally applicable to him as well." *Portuondo v. Agard*, 529 U.S. 61, 69 (2000) (alterations and internal quotation marks omitted). Here, whether Jerry was changing his testimony, whether he was really crying at trial, whether he told dirty jokes, and whether he had some sort of relationship with Andrea's mother were all relevant, truth-seeking questions asked to Jerry as a witness. Accordingly, although inappropriate, they were not improper.

On another occasion during cross-examination, Jerry testified that Whitney came to his home one day without wearing underwear, and the prosecution began a line of questioning about how Jerry knew Whitney was not wearing underwear. Jerry argues the following exchange was improper so as to deny him due process:

Q: How were you able to see that [Whitney was not wearing underwear]?

A: Because she had a dress on, a short dress on.

Q: Well, wouldn't you agree with me even if I had a short dress on here, you wouldn't be able to see whether or not I have underwear on, would you?

> [Defense Counsel]: Please, that's also argumentative and we're not going to get into the prosecutor's underwear, I hope.

> The Court: Overruled

Q: Answer the question.

A: Repeat the question.

Q: If I had a short dress on right now, you wouldn't be able to see whether or not I have underwear on, would you?

A: I wouldn't be looking at you.

Q: I would hope not.

> [Defense Counsel]: Objection, Your Honor. Improper comment.
>
> The Court: Sustained.

The prosecutor also engaged in conduct during closing arguments that Jerry argues constitutes prosecutorial misconduct worthy of habeas relief. The prosecutor referred to Jerry as "atrocious," and claimed he had molested "yet another girl." She also stated, "My parents used to tell me, don't be afraid of the boogey man. There's no boogey man. The boogey man can't hurt you. But I think we need to realize, there is a boogey man, and he's sitting right there." Defense counsel objected to the boogey man diatribe, and his objection was sustained. The prosecutor also referred back to the underwear line of questioning and stated, Jerry "said he didn't want to look at me. Well, of course not. I'm a woman. I'm an adult, he only wants to look at little girls." The trial court overruled defense counsel's objection as to that statement.

Because we are reviewing the state court's opinion solely to determine whether it is contrary to clearly established federal law, as established by Supreme Court precedent, we cannot consider Sixth Circuit precedent for evaluating prosecutorial misconduct that Jerry advances. *Parker*, 132 S. Ct. at 2155. The Supreme Court has made abundantly clear that we may only consider whether the prosecutor's improper comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 2153–55 (internal quotation marks omitted) (noting that this circuit has erred by applying its own precedent in prosecutorial misconduct habeas cases). Indeed, "the appropriate standard of review for such a claim on writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power." *Darden*, 477 U.S. at 181 (internal quotation marks omitted).

With this narrow standard of review in mind, the prosecutor's underwear and "boogey man" statements "undoubtedly were improper" but that is not enough. *See id.* at 180–81. It is also "not enough that the prosecutors' remarks were undesirable or even universally condemned." *Id.* at 181. As the state court reasoned, and the federal district court reiterated, "the evidence [at trial] supported the prosecutor's comments, which, although harsh, did not

constitute misconduct requiring reversal." *Bales*, 2007 WL 1203536, at *2; *see Bales II*, 2013 WL 5539592, at *10. The trial court also repeatedly instructed the jury that what the attorneys said was not evidence and sustained many of defense counsel's objections.

Furthermore, the "evidence against [the] petitioner was heavy . . . [and] reduced the likelihood that the jury's decision was influenced by [the prosecutor's] argument." *Darden*, 477 U.S. at 182. Whitney and Andrea both testified in detail about how Jerry had molested them as young girls, and the circumstantial evidence indicated that Jerry had ample opportunity alone with both girls. Considering the evidence against Jerry, coupled with the trial court's repeated cautionary instructions, and the trial court's sustaining of some of defense counsel's objections, Jerry's trial "was not perfect—few are—but neither was it fundamentally unfair." *See id.* at 183. Finally, the "boogey man" and underwear comments were "unnecessary and unprofessional-but . . . go[] no further than similar comments which have not required setting aside a state conviction." *Bedford v. Collins*, 567 F.3d 225, 234 (6th Cir. 2009) (noting that calling defendant "demon," though unprofessional, does not warrant habeas relief); *see also Olson v. McFaul*, 843 F.2d 918, 930 (6th Cir. 1988) (holding that the prosecutor's repeated references to a defendant as a "deadbeat," a "thief," a "creep," and a "liar" did not violate due process).

Jerry next argues that the prosecutor's statements toward defense counsel warrant habeas relief. We disagree. The Michigan Court of Appeals considered and rejected Jerry's argument that the prosecutor's statements toward defense counsel warrant relief, and its decision was not contrary to Supreme Court precedent, nor an improper determination of the facts. Jerry's trial was contentious to say the least. Both the prosecutor and defense counsel often stepped over the line of professionalism and propriety. The trial court played referee and admonished both parties. As the district court noted, however, "[c]onsidered in this context, it cannot be said that every stray comment or heated remark made by the prosecutor was so improper as to affect the overall fairness of Petitioner's trial." *Bales II*, 2013 WL 5539592, at *13.

Again, the standard is a high one. Our challenge is not to supervise the state court but to ensure that the state court has not contradicted federal law so as to deny a petitioner due process. *See Darden*, 477 U.S. at 181. Jerry cites the prosecutor's running commentary and argues that the prosecutor "attack[ed] . . . defense counsel throughout defense counsel's closing argument."

The prosecutor indicated, "That's improper . . . and counsel knows that." What defense counsel omits in his brief is the context of the prosecutor's statements. During his closing argument, defense counsel stated "Now let me talk about [Jerry's] hearing problem. I always think it's a low blow when the prosecutor goes after somebody about a handicap, which is what this is . . . . He went out and got a second hearing aid because he couldn't hear well in the first trial. And that's the first things she wants to go after. In context, defense counsel's statements were themselves improper. While defense counsel's improper statements do not excuse any improper response by the prosecutor, the defense counsel's statements "invited [a] response" that put the prosecutor's comments into perspective for purposes of evaluating the statements' overall effect on the trial. *Id.* at 182.

The prosecutor's statements likening Jerry's defense to "the O.J. Simpson trial" and asking the court to hold defense counsel in contempt of court in front of the jury, while certainly improper, do not rise to the level of infecting the trial so as to deny Jerry due process, particularly considering the trial court sustained defense counsel's objection to the prosecutor's O.J. Simpson comment. After the prosecutor's request that defense counsel be held in contempt, the trial court again reminded the jury that "what the attorneys say is not evidence . . . . So, anything that the attorneys say that looks to be like testimony, do not regard it as such." The trial court's instructions are generally presumed to have been followed. *See Penry v. Johnson*, 532 U.S. 782, 799 (2001) ("We generally presume that jurors follow their instructions.").

In sum, with regard to the prosecutor's statements toward Jerry, as well as toward defense counsel, Jerry "has not demonstrated that the state court's resolution of his prosecutorial misconduct claims was an unreasonable application of federal law. . . . Moreover, this Court has recognized the effectiveness of curative instructions in mitigating prejudice under similar circumstances." *Hutchison v. Bell*, 303 F.3d 720, 751 (6th Cir. 2002). Jerry is not entitled to habeas relief.

**AFFIRMED.**