NOT RECOMMENDED FOR PUBLICATION
File Name: 18a0620n.06

No. 18-5021

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Dec 14, 2018
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff-Appellee, | ) |
| | ) ON APPEAL FROM THE |
| v. | ) UNITED STATES DISTRICT |
| | ) COURT FOR THE MIDDLE |
| RICKY THOMPSON, | ) DISTRICT OF TENNESSEE |
| | ) |
| Defendant-Appellant. | ) |
| | ) |

BEFORE: BATCHELDER, SUTTON, and WHITE, Circuit Judges.

HELENE N. WHITE, Circuit Judge. Defendant-Appellant Ricky Thompson appeals his convictions of (1) conspiracy to distribute and possess with the intent to distribute 1,000 grams or more of heroin, cocaine, and crack cocaine, in violation of 21 U.S.C. § 846; (2) conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and (h); (3) use of a firearm during and in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A); and (4) conspiracy to commit witness tampering, in violation of 18 U.S.C. §§ 1512(b)(1)–(2) and (k). Thompson asserts that the government violated its disclosure obligations by failing to produce discovery related to the investigation of Thompson's activities; that the crimes proved at trial materially and prejudicially varied from the charged offenses; that venue for his firearm-possession conviction lies in the Northern District of Ohio, not the Middle District of Tennessee; and that his convictions for conspiracy to commit money laundering and conspiracy to commit witness tampering are not supported by sufficient evidence. For the following reasons, we **AFFIRM**.

## I. BACKGROUND

Defendant-Appellant Ricky Thompson was a drug dealer based in Toledo, Ohio. Thompson sold cocaine, marijuana, and as the opioid crisis intensified in 2014, heroin, to both end users and smaller distributors. Thompson was known for the high volume of his drug trade; in the three years preceding Thompson's arrest in March 2016, Thompson's primary supplier, Justin Howard, routinely fronted between 600 and 1,000 grams of heroin per week to Thompson. In his own words, Thompson was "the biggest drug dealer that ever come out of Toledo." (R. 428, PID 2880.)

Although many of his individual buyers lived in and around the Toledo area, Thompson also sold large quantities of heroin to two brothers, Derrick Gilligan and John Rupley, for resale in Tennessee. Rupley had first met Thompson fifteen years earlier when Rupley bought crack cocaine from Thompson in Toledo. Rupley and Thompson had a falling out in 2009, but Gilligan maintained a relationship with Thompson, working as Thompson's "assistant" in his drug-trafficking enterprise while Rupley was incarcerated. (R. 425, PID 2190.) In April 2014, Rupley was released on parole, and he and Gilligan moved to Tennessee to live with an aunt. Shortly after his release, Rupley learned that although heroin sold for $100 per gram in Toledo, he could sell it in Tennessee for two or three times that amount. Thompson found out through Gilligan that Rupley had started selling drugs, and Thompson contacted Rupley about selling his heroin. Gilligan and Rupley made their first trip to Toledo to purchase heroin from Thompson in the summer of 2014.

Rupley's and Gilligan's drug operation rapidly expanded. At first, the brothers would drive from Nashville to Toledo, where Thompson would sell them 20 grams of heroin, and Rupley and Gilligan would return to Nashville. Over the next eight months, Thompson supplied Rupley and Gilligan with increasingly larger quantities of heroin—from 50 grams, to 100 grams, to 300 grams

in their final exchange in March 2015. Thompson also taught Rupley how to cut the heroin with dietary fiber supplements in order to dilute the heroin and maximize profits.

Because Rupley's ability to travel was restricted while he was on parole, he and Gilligan enlisted others to assist in the trips to Toledo.[1] Justin Clements often served as the driver, and made between fifteen and twenty trips to Toledo with Gilligan to purchase heroin from Thompson. Gilligan purchased a conversion van to make the trips to Toledo more comfortable; while Clements drove, Gilligan sat in the back and played video games. Tiffany Wright often rode with Clements to Toledo, returning to Nashville via Greyhound bus with a 100-gram package of heroin. These individuals—like Rupley and Gilligan—were heroin addicts, and typically were paid for their work in heroin. The brothers also used the heroin they bought from Thompson as currency in a separate prostitution conspiracy in which Gilligan recruited vulnerable women over the internet, introduced them to heroin, and induced them to commit prostitution in exchange for heroin. The women, including Alaina Rank and Katie Dias, occasionally assisted Rupley and Gilligan in their drug-trafficking scheme by traveling to Toledo and transporting the drugs back to Nashville.

The brothers used varied methods to pay for the heroin. Initially, they paid Thompson in cash, in person. Once, in lieu of cash, the brothers paid Thompson with a truck-load of stolen televisions that Thompson wanted for a sports bar he was managing. After a highway-patrol stop en route to Toledo in November 2014 resulted in the seizure of nearly $10,000 with which Gilligan intended to buy heroin, Thompson began fronting the heroin to Rupley and Gilligan and accepted larger, less-frequent cash payments. Thompson also instructed Rupley and Gilligan to wire funds to him through Wal-Mart's money-order service, using intermediaries to both send and collect the money in order to disguise their identities.

---

[1] Rupley himself traveled to Toledo "somewhere around 10" times to purchase drugs from Thompson. (R. 425, PID 2251).

When Rupley and Gilligan were arrested by federal authorities in March 2015, Thompson took steps to protect himself from law-enforcement scrutiny. While in pre-trial detention, Gilligan sent discovery materials to Thompson through an uncharged co-conspirator (Samantha Napier) to warn Thompson that he had been identified as their heroin supplier. Napier was later served a subpoena to testify before the grand jury. Gilligan urged Napier to ignore the subpoena, suggesting that she would receive only minor punishment if she failed to appear.

After Rupley and Gilligan were arrested, Thompson continued his drug-trafficking operations for nearly a year. The Toledo Metro Drug Task Force began surveilling Thompson in November 2015. The Task Force used confidential informants to perform controlled buys from Thompson at several different residences owned by Thompson, and conducted "almost daily" surveillance of Thompson. (R. 344-1, PID 1147–62.)

On March 2, 2016, law-enforcement authorities arrested Thompson at one of his Toledo homes. The search of his residence yielded approximately $10,000 in cash, a large quantity of heroin, cocaine, crack cocaine, and a firearm. A search of Thompson's white Cadillac, which was registered in his girlfriend's name and parked in his neighbor's driveway, revealed bags of marijuana, heroin, six handguns, and a loaded AR-15 rifle.

## II. PROCEDURAL HISTORY

On April 29, 2015, a grand jury in the Middle District of Tennessee named Rupley and Gilligan in an indictment charging a conspiracy to distribute and possess with the intent to distribute heroin. A superseding indictment filed on October 14, 2015 named Clements and Wright as co-conspirators, and added three counts alleging interstate prostitution and a conspiracy to commit interstate prostitution. Thompson was added to the heroin conspiracy in a second superseding indictment filed February 3, 2016. Finally, after several co-defendants had finalized plea agreements with the government, the grand jury filed a third superseding indictment on

September 14, 2016. The third superseding indictment charged Thompson in four counts: (1) conspiracy to distribute and possess with the intent to distribute 1,000 grams or more of a mixture or substance containing heroin; (2) conspiracy to commit money laundering; (3) possession of a firearm in furtherance of a drug-trafficking crime; and (4) conspiracy to commit witness tampering.

In the lead-up to trial, Thompson attempted several times to obtain discovery from the Task Force investigation of his drug activities in the Northern District of Ohio. On February 14, 2017, Thompson filed a motion to extend the deadline for pretrial motions on the ground that he had not received discovery related to the Toledo-based drug investigation other than the affidavits supporting the search warrants of Thompson's properties. Thompson argued that the government was likely in possession of "visual surveillance, video surveillance, pole camera[s], confidential informants and . . . wiretap evidence" to which he was entitled. (R. 231, PID 516.) Thompson later filed a motion to compel the government to "reveal to the defendant and permit inspection and copying of all information and material known to the government which may be favorable to the defendant on the issues of guilt or punishment." (R. 289, PID 746.) Thompson demanded "full discovery as it relates to the warrants issued for the search of his properties and the investigation undertaken against him." (*Id*. at PID 747.) Thompson also sought "the pretrial production of any statement (whether exculpatory or inculpatory) made by either co-defendants or co-conspirators who are not prospective witnesses in this action." (R. 287, PID 741.)

The district court denied Thompson's motion to compel as moot after the government assured the Court that it had complied with its discovery obligations, and that it "has not and will not withhold any discovery to which either Defendant is entitled." (R. 324, PID 1021–22.) The district court did not conduct an in camera review of the investigative materials. The district court

also denied Thompson's motion to compel statements by his co-conspirators, explaining that Rule 16 does not require pretrial discovery of non-testifying co-conspirator statements. (*Id*. at PID 1022–23.)

Thompson's trial commenced on July 11, 2017. Immediately after opening statements, defense counsel orally raised a motion to exclude all evidence derived from the investigation in the Northern District of Ohio on the grounds that Thompson had been "denied any meaningful information related to the portion of the conspiracy alleged to have occurred in the Northern District of Ohio." (R. 423, PID 1760–64; R. 344, PID 1078.) The district court deferred ruling on the oral motion, and later denied the renewed motion on the written submissions, finding that "Defendant's entire motion is essentially premised upon his speculation that certain discovery exists and that it has not been turned over. However, in making this argument, Defendant does not identify any evidence that the Government was required—but failed—to turn over." (R. 362, PID 1428.)

After a seven-day jury trial, Thompson was convicted on all counts. Thompson moved for judgment of acquittal, which the district court denied. Thompson then moved for a new trial, arguing that his convictions were contrary to the weight of the evidence.[2] The district court denied the motion for new trial. The district court sentenced Thompson to 420 months' imprisonment, and he appeals.

### III. DISCUSSION

### A.

Thompson first argues that the government violated its disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and Rule 16 of the Federal Rules of Criminal Procedure by

---

[2] Thompson also asserted various legal errors that he did not raise on appeal.

failing to produce information gathered by law-enforcement authorities in its investigation of Thompson's drug activity in the Northern District of Ohio.

We assess the existence of a *Brady* violation de novo. *United States v. Fields*, 763 F.3d 443, 458 (6th Cir. 2014). We review a court's decision under Rule 16 for abuse of discretion. *United States v. Maples*, 60 F.3d 244, 246 (6th Cir. 1995).

Under *Brady*, the government must disclose evidence "in its possession that is both favorable to the accused and material to guilt or punishment." *Fields*, 763 F.3d at 458 (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987)). To establish a *Brady* violation, a defendant must show that (1) the prosecutor suppressed evidence, (2) the evidence was favorable to the defense, and (3) the suppressed evidence was material. *Id.* (citing *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000)). A deprivation of due process occurs where all three elements are present. *United States v. Dado*, 759 F.3d 550, 560 (6th Cir. 2014) (citation omitted). "The principles in *Brady* have been extended to the disclosure of impeachment evidence in cases where the reliability of a given witness may well be determinative of guilt or innocence." *United States v. Smith*, 749 F.3d 465, 489 (6th Cir. 2014) (citation and internal question marks omitted).

Evidence is material only if there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Ramer*, 883 F.3d 659, 672 (6th Cir. 2018) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Bagley*, 473 U.S. at 682.

Thompson's *Brady* challenge fails. First, Thompson has not met his burden of showing that any evidence alleged to be in the possession of the state is "favorable to the accused, either because it is exculpatory, or because it is impeaching." *Strickler v. Greene*, 527 U.S. 263, 281–82

(1999). We do not know whether the full investigative file actually contains exculpatory or impeachment evidence; Thompson did not request an in camera review of the materials, and the district court did not conduct one.[3] And Thompson fails to advance any argument explaining why the investigative materials would exculpate him or impeach witnesses who testified against him. Thompson seems to argue that the investigative materials, by virtue of the breadth of the investigation, likely include communications or surveillance footage that may be relevant to his defense. For example, Thompson speculates that the government is in possession of written reports of Task Force surveillance of him and Justin Howard, as well as data extracted from Howard's cell phone. Thompson notes that Howard's testimony was material to his sentencing, because Howard's testimony regarding their drug transactions formed the basis for Thompson's sentencing offense-level. Thompson does not explain why Howard's cell-phone data would impeach Howard's testimony, however, and Thompson does not allege that Howard was untruthful at trial. Nor does Thompson dispute that the government had already produced "hundreds, if not thousands, of pages of Jencks [Act] material," including witness statements describing the scope of the conspiracy and the connections between Ohio and Nashville. (R. 324, PID 1021.)

We rejected a similar argument in *United States v. Driscoll*, in which a defendant sought the disclosure of his arresting officers' personnel files on the ground that they might contain impeachment evidence. 970 F.2d 1472, 1482 (6th Cir. 1992), *abrogated on other grounds by Hampton v. United States*, 191 F.3d 695 (6th Cir. 1999). Noting that "[t]here is no general

---

[3] The district court denied Thompson's motion to compel as moot based on the government's assertion that it "complied with all applicable discovery obligations and . . . is aware of its continuing obligation to provide such discovery." (R. 324, PID 1021.) We cannot say that this was improper. "[B]ecause prosecutors are officers of the court, district courts may take them at their word when they inform the court that they have reviewed specified sealed documents and that those documents do not contain material subject to compulsory disclosure under *Brady*." *United States v. Carmichael*, 232 F.3d 510, 517 (6th Cir. 2000) (quoting *United States v. Hernandez*, 31 F.3d 354, 361 (6th Cir.1994)). In the absence of "some indication of misconduct" by the government, the district court is not required to conduct an in camera review to verify the government's assertion. *Hernandez*, 31 F.3d at 361.

constitutional right to discovery in a criminal case," we held that the defendant could not establish a *Brady* violation by merely speculating that the government was in possession of evidence that may have been favorable to him. *Id.* (quoting *United States v. Todd*, 920 F.2d 399, 405 (6th Cir. 1990)). Although it is more likely that an investigation focused on the defendant has information helpful to the defendant's case than an officer's general personnel file, Thompson offers only speculation that the undisclosed investigative materials include exculpatory or impeachment evidence.

Second, Thompson has not shown that any undisclosed evidence was material. The "touchstone of materiality" is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. White*, 492 F.3d 380, 410 (6th Cir. 2007) (quoting *Bagley*, 473 U.S. at 682). "The materiality inquiry involves weighing the value of the undisclosed evidence relative to the other evidence produced by the state." *Ramer*, 883 F.3d at 672 (citation omitted).

Even if we were to assume that the investigative materials included evidence that could impeach Howard's credibility, we find no reason to think the evidence would "undermine confidence in the outcome" of Thompson's trial. *Bagley*, 473 U.S. at 682. Thompson's role in the drug conspiracy was described in detail by his co-conspirators Howard and Rupley, and several other witnesses testified about traveling to Toledo to obtain heroin from Thompson, including Tiffany Wright, Justin Clements, and Shane Persich. Photographs of the evidence seized from Thompson's Toledo residence—including guns, drugs, and various drug paraphernalia, were introduced at trial and authenticated by the FBI agents who inventoried the evidence, corroborating the testimony of Thompson's co-conspirators. Other witnesses testified that Thompson spoke to them about the scope of his drug-trafficking operation, including Cassandra O'Brien and Joshua

Chapman. In other words, even had the jury heard evidence that impeached Howard's credibility, we cannot find any reasonable probability that the evidence would have changed the verdict in this case.

Further, Howard testified that he was currently serving a nine-year term of incarceration for drug trafficking and possession. As a result, to the extent the undisclosed evidence would impeach Howard by implicating him in drug crimes, such evidence would be merely cumulative. *See Ramer*, 883 F.3d at 672 ("[W]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable . . . the undisclosed evidence may be cumulative, and hence not material.") (quoting *Bales v. Bell*, 788 F.3d 568, 574 (6th Cir. 2015)).

Nor has Thompson proven a violation of Rule 16. Rule 16(a)(1)(E) requires the government to disclose information "within the government's possession, custody, or control" where (1) the item is material to preparing the defense, (2) the government intends to use the item in its case-in-chief at trial, or (3) the item was obtained from or belongs to the defendant. Fed. R. Crim. P. 16(a)(1)(E). Thompson does not argue that the government failed to properly produce any evidence used in its case-in-chief, or that the government is in possession of items belonging to him. Thompson contends only that the unproduced documents are material to his defense.

The Supreme Court has defined "defense" in the context of Rule 16 to mean the "defendant's response to the Government's case in chief." *United States v. Armstrong*, 517 U.S. 456, 462 (1996). Therefore, the rule "applies only to 'shield' claims that refute the Government's arguments that the defendant committed the crime charged." *United States v. Semrau*, 693 F.3d 510, 529 (6th Cir. 2012) (citation omitted). A defendant does not satisfy Rule 16's materiality requirement "by means of merely conclusory arguments concerning materiality." *United States v.*

*Phillip*, 948 F.2d 241, 250 (6th Cir. 1991). Rather, to obtain discovery of the item, the defendant must make a prima facie showing of materiality. *Id*. "In assessing materiality, we consider the logical relationship between the information withheld and the issues in the case, as well as the importance of the information in light of the evidence as a whole." *United States v. Lykins*, 428 F. App'x 621, 624 (6th Cir. 2011) (citing *United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993)).

Thompson asserts that the affidavits filed by Agent Kyle Fulmer in support of the search warrants for two of his Toledo residences demonstrate that the withheld information is material to his defense because the affidavits reveal how elaborate the investigation was. The 20-page affidavits survey the five-month investigation into Thompson's drug-trafficking operation in Toledo, and include detailed restatements of the information provided by confidential sources, descriptions of multiple controlled buys of heroin from Thompson, and an analysis of the surveillance of Thompson and his various properties by the Task Force. The affidavits also summarize Agent Fulmer's experience with narcotics investigations and the various methods and techniques typically used in such investigations.

Although the affidavits suggest that additional documentation regarding the Task Force's investigation exists, Thompson has not demonstrated that the disclosure of additional investigative materials would have "refute[d] the Government's arguments that the defendant committed the crime charged." *Semrau*, 693 F.3d at 529 (quotation omitted). Thompson has made no argument that the undisclosed information would exculpate him or undermine the government's case against him. "[T]here must be an indication that pre-trial disclosure would have enabled the defendant to alter the quantum of proof in his favor. . . ." *Lykins*, 428 F. App'x at 624 (quotation omitted). Given the weight of the evidence presented by the government and the fact that the government

timely produced Jencks Act material and statements by the witnesses who testified at trial, there is no such indication that additional disclosure would have enabled Thompson to "alter the quantum of proof in his favor." *Id*. (quotation omitted).

Thompson has not met his burden of showing that additional discovery would be material to his defense, and the district court did not abuse its discretion in denying Thompson's motion to compel its production.

**B.**

Thompson next argues that there was a prejudicial variance between the third superseding indictment and the government's proof at trial. Specifically, he contends that the indictment alleged a single drug-trafficking conspiracy that included Thompson, Rupley, Gilligan, and others, to distribute heroin in the Middle District of Tennessee, but the evidence at trial showed two distinct conspiracies: one between him and Justin Howard to distribute heroin in Toledo, and a second, separate conspiracy to distribute heroin and engage in prostitution in Tennessee. Thompson concedes his involvement in the Toledo conspiracy, but argues that the government's evidence showed only that he had a buyer-seller relationship with Rupley and Gilligan, and was insufficient to show he joined the Tennessee conspiracy. Thompson contends that he exercised no control or authority over Rupley, Gilligan, or their co-conspirators in Tennessee, and functioned solely as a seller in a sales-transaction relationship. We review this challenge de novo. *United States v. Beals*, 698 F.3d 248, 258 (6th Cir. 2012) (citation omitted).

A variance occurs when "the charging terms of the indictment are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *Beals*, 698 F.3d at 258 (quoting *United States v. Swafford*, 512 F.3d 833, 841 (6th Cir. 2008)). In a conspiracy prosecution, a variance demands reversal only if (1) "the indictment alleged one conspiracy, but

the evidence can reasonably be construed only as supporting a finding of multiple conspiracies,"

and (2) the variance prejudiced the defendant. *Id.* (quoting *United States v. Williams*, 612 F.3d

417, 423 (6th Cir. 2010)). As we explained in *Beals*:

> A single conspiracy is not converted to multiple conspiracies simply because it can be subdivided, or because there are changes in the individuals involved or the roles that they play in the conspiracy. Nor does conversion take place simply because each member of the conspiracy did not know every other member, or because each member did not know of or become involved in all of the activities in furtherance of the conspiracy. In determining the number of conspiracies, we consider whether there was a common goal among the participants, the nature of the scheme, and the extent of overlap in the participants' various dealings.

*Beals*, 698 F.3d at 259 (internal citations and quotation marks omitted). Whether the government

has proved one or multiple conspiracies is a question of fact we consider in the light most favorable

to the government. *United States v. Smith*, 320 F.3d 647, 652 (6th Cir. 2003).

Viewed in the light most favorable to the government, the evidence at trial was sufficient

for the jury to find the existence of a single conspiracy to distribute heroin that included Thompson,

Gilligan, Rupley, and others. First, Thompson shared a common goal with Rupley and Gilligan:

to make money by taking advantage of the higher sales price of heroin in the Nashville area.

Rupley testified that Thompson reached out to him when he learned that Rupley was selling drugs

because "I'm very good for him if I'm selling drugs . . . I make him a lot of money." (R. 425, PID

2189.) Rupley further testified that Thompson taught Rupley and Gilligan how to cut the heroin

in order to "stretch it so you can make a bigger quantity and make it less potent, make more

money." (*Id.* at PID 2192.) Rupley testified that after an incident in which Gilligan and Rupley

were briefly detained by police in a hotel room and Rupley flushed his stash of heroin, Thompson

fronted 25 grams of heroin to Rupley to help him get back on his feet. According to Rupley,

Thompson "can't make no money if [Rupley doesn't] have no money to spend." (*Id.* at PID 2193–

94.)

Second, the nature of the scheme suggests a single conspiracy. The conspiracy in this case is a quintessential "chain" conspiracy. *United States v. Caver*, 470 F.3d 220, 233–34 (6th Cir. 2006). Howard sourced the heroin from Arizona and fronted large quantities to Thompson, who then sold or fronted the heroin to Rupley and Gilligan. Although Thompson may not have known many of the details of Rupley and Gilligan's activities in Nashville, "[i]n a drug distribution chain conspiracy, it is enough to show that each member of the conspiracy realized that he was participating in a joint venture, even if he did not know the identities of every other member, or was not involved in all the activities in furtherance of the conspiracy." *United States v. Martinez*, 430 F.3d 317, 332–33 (6th Cir. 2005) (citation and internal quotation marks omitted). The trial testimony here demonstrated that Thompson worked closely with Rupley and Gilligan for their mutual benefit by teaching them to cut the heroin and fronting heroin on a credit basis. Accordingly, the government's evidence was sufficient to prove a single conspiracy, and there was no variance between the third superseding indictment and the offenses proved at trial.

To the extent that Thompson argues the government failed to prove he was a member of that single conspiracy because he was merely a seller of drugs, the evidence shows otherwise. We have held that "a buyer-seller relationship alone is insufficient to tie a buyer to a conspiracy because mere sales do not prove the existence of the agreement that must exist for there to be a conspiracy." *United States v. Deitz,* 577 F.3d 672, 680 (6th Cir. 2009) (citation and internal quotation marks omitted). In determining whether a simple buyer-seller relationship exists, we consider "(1) the length of the relationship; (2) the established method of payment; (3) the extent to which transactions are standardized; and (4) the level of mutual trust between the buyer and the seller." *Id*. at 681 (citations omitted).

The length of the relationship and the trust between the parties in particular point to a conspiracy in this case. Thompson sold Rupley and Gilligan hundreds of grams of heroin over an eight-month conspiracy involving at least twenty separate trips from Nashville to Toledo. A series of multiple transactions involving large quantities can be sufficient to show participation in a drug conspiracy, rather than a buyer-seller relationship. *See United States v. Pritchett*, 749 F.3d 417, 431 (6th Cir. 2014) ("evidence of repeat purchases from a single source and large volumes of narcotics creates an inference of conspiracy" (citation omitted)); *United States v. Martinez*, 430 F.3d 317, 333 (6th Cir. 2005) (defendant regularly purchased cocaine from co-conspirator and traveled with another co-conspirator to purchase drugs). Further, the evidence showed that Thompson sold the heroin to Rupley and Gilligan with the mutual intent that it be transported to Tennessee for sale.

Additionally, "[w]e have recognized that the trust involved in fronting drugs under a delayed payment or credit arrangement suggests more than a buyer-seller arrangement between the parties." *United States v. Henley*, 360 F.3d 509, 514 (6th Cir. 2004) (citation and internal quotation marks omitted). Although Rupley and Gilligan initially paid for their heroin in cash, Thompson later began fronting the drugs to them on credit in order to minimize the risk that the cash would be seized by law enforcement. By fronting drugs to Rupley and Gilligan, Thompson signaled a degree of trust between the conspirators that suggested more than a pure sales relationship. *See United States v. Nesbitt*, 90 F.3d 164, 167 (6th Cir. 1996) ("the trust involved in [a] delayed payment arrangement suggests more than a buyer-seller relationship").

In short, the evidence established that Thompson was not merely a seller of drugs, but rather was a member of a single conspiracy to traffic heroin between Toledo and Nashville.

**C.**

Thompson challenges his conviction for possession of a firearm in furtherance of a drug conspiracy on the ground that venue was improper in the Middle District of Tennessee. Thompson argues that "if the proof offered was not sufficient to show an 'overarching' drug conspiracy then the Northern [D]istrict of Ohio is the proper venue for this charge." (Appellant's Br. at 42.)[4] We review the denial of a motion for judgment of acquittal based on improper venue de novo. *United States v. Kuehne*, 547 F.3d 667, 677 (6th Cir. 2008).

It is well-established that "venue is proper in conspiracy prosecutions in any district where the conspiracy was formed or in any district where an overt act in furtherance of the conspiracy was performed." *United States v. Williams*, 274 F.3d 1079, 1083 (6th Cir. 2001) (quoting *United States v. Scaife*, 749 F.2d 338, 346 (6th Cir. 1984)). So long as venue is proper for a drug-conspiracy charge, it is also proper for a § 924(c) charge predicated on that drug conspiracy. *Kuehne*, 547 F.3d at 677 (citing *United States v. Rodriguez-Moreno*, 526 U.S. 275, 281–82 (1999)).

Thompson did not argue below, and does not argue on appeal, that venue was improper for the conspiracy charge. Thus, because the government adduced sufficient evidence at trial to prove a single conspiracy that included acts in the Middle District of Tennessee, Thompson's argument regarding venue is without merit.

**D.**

Finally, Thompson asserts that the evidence presented at trial was insufficient to prove he committed conspiracy to commit money laundering or conspiracy to commit witness tampering. We review the sufficiency of the evidence at trial de novo. *United States v. Napier*, 787 F.3d 333,

---

[4] Thompson does not challenge the sufficiency of the evidence of his firearm conviction.

344 (6th Cir. 2015).  On review, we determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.* at 344–345 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  "We can neither independently weigh the evidence, nor make our own assessment of the credibility of the witnesses who testified at trial."  *United States v. Garcia*, 758 F.3d 714, 718 (6th Cir. 2014) (quoting *United States v. Howard*, 621 F.3d 433, 460 (6th Cir. 2010)).

*1. Money Laundering*

18 U.S.C. § 1956 "penalizes the knowing and intentional transportation or transfer of monetary proceeds from specified unlawful activities."  *Whitfield v. United States*, 543 U.S. 209, 212 (2005).  The statute provides:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity . . . shall be [subject to criminal penalties].

18 U.S.C. § 1956(a)(1).  Section 1956(h) criminalizes conspiring to commit money laundering. *Id.* § 1956(h).  To prove a defendant guilty of money laundering under § 1956(a)(1), the government must demonstrate that the defendant: (1) conducted a financial transaction that involved the proceeds of unlawful activity; (2) knew the property involved was the proceeds of unlawful activity; and (3) intended to promote that unlawful activity.  *United States v. Warshak*, 631 F.3d 266, 317 (6th Cir. 2010) (citation omitted).  "The paradigmatic example of this crime is a drug dealer using the proceeds of a drug transaction to purchase additional drugs and consummate future sales."  *Id.* Thompson argues that the evidence at trial failed to establish that the Wal-Mart-to-Wal-Mart money transfers were funded with the proceeds of unlawful activity.

The government presented sufficient evidence from which a rational jury could hold Thompson criminally liable. First, a jury could find that the Wal-Mart-to-Wal-Mart wire transfers from Tennessee to Ohio involved the proceeds of unlawful activity. Rupley testified that Thompson "told me he needed some money for something bad, so he asked me if I would Wal-Mart-to-Wal-Mart it." (R. 425, PID 2226–27.) He further testified that he sent the money to pay Thompson for drugs that Thompson had already fronted. Rupley's testimony was corroborated by Katie Dias, whom Rupley directed to send two transfers. Dias testified, "[m]y understanding was that it was payment for heroin . . . I would get a name, send it to this person, and they would pick it up on the other side." (R. 427, PID 2824–25.) Lauren Leonard, Gilligan's then-girlfriend, testified that she transferred $900 to Thompson through Wal-Mart. She explained that she transferred the money because Gilligan instructed her to; "I'm assuming that he just owed him money. That's what I thought it was for." (R. 425, PID 2141.)

Thompson correctly notes that no witness stated directly that the transactions consisted solely of ill-gotten funds; when asked where the money for the transfers came from, Rupley only answered, "[o]ut of my safe." (R. 425, PID 2257.) Nevertheless, the jury could rationally draw the inference that Rupley used the proceeds of the drug-trafficking conspiracy to fund the transfers. Lauren Leonard testified that the brothers were working at an auto-repair shop in Nashville during the time of the conspiracy, but that their primary source of income was selling heroin. She stated that Rupley and Gilligan were able to afford their luxury apartment only because of "the drug money." (R. 425, PID 2130.) Even assuming the brothers' legitimate income from their work as mechanics was mixed in with proceeds of their heroin and prostitution conspiracies, we have held that in such situations "not all of the money involved in the transactions must be derived from the unlawful activity" in order to prove money laundering. *United States v. Jamieson*, 427 F.3d 394,

404 (6th Cir. 2005). Rather, "[w]hen money from illegal sources is co-mingled with money from unspecified other sources, all such funds are attributable to the money laundering scheme." *Id.* (citation and internal quotation marks omitted). Accordingly, a rational juror could conclude the Wal-Mart money transfers "involved the proceeds of unlawful activity." *Warshak*, 631 F.3d at 317 (quotation omitted).

The evidence also shows that Thompson knew the transactions involved the proceeds of unlawful activity. Rather than wiring the funds in his own name, Rupley sent several individuals to a nearby Wal-Mart to initiate the transfers, including Katie Dias, Alaina Rank, Justin Clement, and Tiffany Wright, in an apparent attempt to shield his identity. Similarly, the wire transfers were not addressed to Thompson, but were each sent to a different participant in Thompson's Toledo operation. For example, Robert Halliburton testified that he attempted to pick up a Wal-Mart wire transfer for Thompson. Halliburton testified that Thompson "gave me a name, and I was supposed to go to Wal-Mart . . . and ask if anything came in for this person, and that's all I know." (R. 427, PID 2668). Halliburton stated that he did not know why the money was being sent, but that it was not for him. Due to an apparent glitch in the transfer system, Halliburton was not actually able to retrieve the money, and he informed Thompson that the transfer failed. According to Rupley's testimony, Thompson called him after he learned of the failed transfers and instructed Rupley to return to the Wal-Mart and cancel the wire transfers that were pending. Thompson's use of intermediaries to distance himself from the transactions and his decision to abort the pending transfers suggests that Thompson knew the transactions involved the proceeds from unlawful activity.

Finally, given the large volume of drug sales Thompson conducted and Rupley's testimony that Thompson "needed some money for something bad," it would be rational for the jury to infer

that the money sent through Wal-Mart would have been used to further Thompson's drug-trafficking enterprise. *See Warshak*, 631 F.3d at 317.

Based on the government's trial evidence, a rational juror could find that Thompson knowingly conducted a financial transaction that involved the proceeds of heroin sales and that those transactions were intended to promote unlawful activity. See *United States v. Williamson*, 656 F. App'x 175, 184 (6th Cir. 2016) (evidence that the defendant received payment for selling drugs and used that money to purchase more drugs is sufficient to sustain money-laundering conviction). Accordingly, the district court properly denied Thompson's motion for judgment of acquittal on his conviction for money laundering.

*2. Conspiracy to Commit Witness Tampering*

To convict Thompson of conspiracy to commit witness tampering, the government was required to prove that Thompson knowingly joined an agreement to intimidate, threaten, or corruptly persuade another person, with the intent to influence or prevent the person's testimony in an official proceeding, or to cause or induce the person to withhold testimony or be absent from the official proceeding. *See* 18 U.S.C. § 1512(b), (k); *see also United States v. LaVictor*, 848 F.3d 428, 458 (6th Cir. 2017).

We conclude a rational juror could find Thompson guilty of conspiracy to commit witness tampering based on the government's evidence. Rupley testified that Gilligan sent discovery materials from jail to Samantha Napier with instructions to pass them on to Thompson. Later, Napier was subpoenaed to testify before the grand jury regarding those materials. Thompson's former partner, Renata Tatum, and his nephew, Ricky Slater, testified that Thompson asked them to make contact with Samantha Napier. Tatum called Napier five times in three days on behalf of Thompson.

Thompson asserts that there was no proof that he threatened or attempted to persuade Napier to withhold testimony or ignore the grand-jury subpoena, and indeed, Tatum denied that Thompson instructed her to threaten or intimidate Napier, testifying, "[h]e was trying to see what was going on, what—like, I don't know what was her purpose of coming [to the grand jury] or what, what was going to be said or something. I'm not sure." (R. 429, PID 2864.)

There was evidence contradicting Tatum, however. For example, a recorded jailhouse call indicated that Napier was apparently afraid to testify.[5] She told Gilligan that agents had asked her about her role delivering Gilligan's investigative materials to Thompson, and that as a result of the search of Thompson's properties, agents had obtained video footage of Napier buying heroin from Thompson. Napier was clearly troubled by the subpoena, telling Gilligan that she feared that "they're gonna kill my family if I say anything." (*Id*. at 3:10–3:11.) Further, the text of the letter sent by Thompson to Shelbie Ortega, Napier's daughter, helps explain Thompson's intentions. As read into the record through Tatum's testimony, Thompson's letter reads:

> Hello Shelbie. What's up with you? Well, for me, I'm doing okay. Just waiting to go to court. This shit. I'm going to—but, anyway, I don't like talking about too much in my letter, so watch what you say, okay? So you doing good? I'm happy for you. I always say you was a nice lady. I hope that you do the right thing when it's time for you to get out. Try to get your kids and live life with your kids. That's the way to go out there. Well, hope to see you out there. Well, if you talk to your mom, you tell her I said, **do [sic] f--k with Kit. She—the police. And I'm going to get her.** Don't write me back talking about her. They read my mail. So tell her that—don't talk about the street, okay? Much love, B.

(R. 428, PID 2846 (emphasis added).) Thompson deliberately referenced a woman named Kit, and threatened to "get her" due to her cooperation with the police. The implication seems obvious: Ortega should discourage her mother from cooperating with the police, or Thompson will "get her" as well.

---

[5] Napier died prior to trial.

Finally, Thompson sought to influence the testimony of both Rupley and Joshua Chapman, with whom he was incarcerated. Rupley testified that Thompson urged him to "come to court and say that I'm just a friend of his, that when I come to Toledo, I come to his house and hang out and smoke weed; I do not buy drugs from him." (R. 425, PID 2239.) According to Rupley, Thompson also asked for the address of Shane Persich, who had twice traveled with Rupley to Toledo. Rupley testified that Thompson said that Persich "need[ed] to be took care of." (*Id*.) A rational juror could interpret Thompson's threat against Persich as an implied threat to Rupley if Rupley were to testify at trial.

Joshua Chapman, Thompson's cellmate, also testified that Thompson sought to influence his cooperation. According to Chapman, Thompson asked him to lie to an investigator about his co-conspirator Justin Clements, who had previously been Chapman's cellmate. Chapman stated that Thompson wanted him to falsely testify that he had read letters between Rupley and Clements in which they conspired to frame Thompson as their supplier because he is black. Chapman testified that he understood Thompson to be attacking Rupley and Clements "[b]ecause they were testifying against him [at] trial." (R. 428, PID 2888.)

Based on this evidence, a rational juror could find that Thompson knowingly agreed with others to intimidate, threaten, or corruptly persuade another person with the intent to influence or prevent the person's testimony in an official proceeding.

## IV. CONCLUSION

For these reasons, we **AFFIRM** the judgment of the district court.